**Patrick STRAUSS and Michael A. Strauss, et al., Appellants,**

v.

**NEWMARKET GLOBAL CONSULTING GROUP, LLC, et al., Appellees.**

**Nos. 08–CV–1021, 08–CV–738.**

District of Columbia Court of Appeals.

Argued Oct. 21, 2009.

Decided Oct. 14, 2010.

---

**2.** Bd. Prof. Resp. R. 17.5; D.C. Bar R. XI, § 12.1(c) (2009).

**3.** Bd. Prof. Resp. R. 17.6.

**4.** D.C. Bar R. XI, § 12.1(d) (2009).

 
 
 
 
 
 
 
 
 
 

 
 
 

 
 
 
 

 
 
 
 

 
 
 
 

 
 
 
 

 
 

 
 
 
 

 

---

William A. Davis, with whom Noam B. Fischman, Washington, DC, was on the brief, for appellant Patrick Strauss.

Robert J. Flynn Jr., Huntington, NY, with whom Paul J. Riley was on the brief, for appellants Michael A. Strauss, et al.

Christopher Wheeler, Washington, DC, with whom Philip J. McNutt was on the brief, for appellees NewMarket Global Consulting Group LLC, et al.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and NEWMAN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

In this case, we are asked to determine whether an enforceable oral contract resulted from a series of conversations between two experienced businessmen: appellant Patrick Strauss, President of Icon Insurance Group, Inc. ("Icon"), and appellee Christopher Schrichte, President of appellee NewMarket Global Consulting Group, LLC ("NewMarket"). On appeal, Patrick Strauss seeks a reversal of the trial court's determination that an enforceable oral contract existed between him and Schrichte to split brokerage commissions, consulting fees, or finder or solicitor's fees. Additionally, appellant Michael Strauss, Patrick Strauss' father and the President of Icon spin-off company Private Equity Partners, LLC ("PEP"), contends that the trial court erred in dismissing with prejudice his counterclaim against NewMarket for breach of an oral accord and satisfac-tion and interference with an advantageous economic relationship.

We conclude that no enforceable oral contract existed between the parties. Given the oral nature of this alleged agreement involving a complex business transaction and the lack of evidence of the material terms of the alleged contract, appellees do not meet their burden of proving that there was a mutual agreement between the parties to split brokerage commissions, consulting fees, or finder or solicitor's fees. Additionally, we conclude that the trial court erred in dismissing the counterclaim with prejudice. Finally, because we conclude that no enforceable contract existed between Patrick Strauss and Schrichte, we do not reach or address Patrick Strauss' claims that the trial court erroneously pierced the corporate veil to find him personally liable, that appellees' claims were barred by the statute of limitations, or that the trial court erred in calculating damages. Accordingly, we reverse the trial court's judgment finding Patrick Strauss liable for breach of contract. We also reverse the trial court's decision to dismiss the counterclaim against Schrichte and NewMarket and remand to the trial court with instructions to reinstate the counterclaim consistent with this opinion.

## I.

Appellant Patrick Strauss, a newly licensed stockbroker and investment consultant, and Schrichte, a former stockbroker with fifteen years of experience who no longer held a brokerage license, were introduced by a mutual friend. Soon after being introduced, they met over lunch at a restaurant in Tyson's Corner, Virginia in November 1998. Both parties contest the facts surrounding this meeting. Schrichte contends that during the meeting, he and Patrick Strauss orally agreed that they

would refer their business contacts and potential investors to each other. According to Schrichte, they agreed that the party making the referral would receive a 60% share of any resulting fees earned from the client's investments. Patrick Strauss disputes this and contends that the purpose of the meeting was to discuss potential business opportunities in the future.

The day after their lunch meeting, Schrichte prepared a memorandum ("November 19th memorandum"), which he contends memorialized the oral agreement. However, Patrick Strauss contends that the November 19th memorandum was merely a proposal for his consideration and not a memorialization of any oral agreement. Patrick Strauss never responded to the memorandum. The November 19th memorandum referred to a proposed 60/40 compensation split for transactions with two companies, Blueline/Online and Ballard Petroleum, neither of which is the subject of the instant dispute between the parties. The November 19th memorandum states in full:

> As we discussed yesterday our agreement is as follows. I will agree to compensate you for introductions on NCG [NewMarket Consulting Group] originated deals at a rate of 24% of fees and [warrants] received for the Blueline/Online deal and a 33% split of compensation and [warrants] for monies received as a reseller. The split will be 33% of compensation for the Ballard Petroleum deal with the possibility of a 50% split of the warrants should a deal be worked out for some [warrants] above $5 mil being raised. Further compensation on NCG [NewMarket Consulting Group] originated deals will be agreed to on a case by case basis. As for deals you originate, our current agreement is for a 60/40% split of compensation and [warrants] with 100% paid to NCG and 40% of this paid out to you upon completion. *Future deals you originate will be split on a case by case basis.* (emphasis added)

After the November 19th memorandum was sent, Schrichte introduced Patrick Strauss to his former brokerage client, a wealthy investor named Francois Bitz, at a Super Bowl party in January 1999. Bitz became Patrick Strauss' brokerage client at Merrill Lynch and maintained his account with Strauss when Strauss moved to Morgan Stanley and to Deutsche Bank Alex Brown. Patrick Strauss contends that he paid Schrichte 10% of the brokerage commissions that he earned from Bitz's trading activities while he was employed at Merrill Lynch and Morgan Stanley to "show gratitude" for introducing him to Bitz. Patrick Strauss now says that these payments were illegal because Schrichte was no longer a licensed agent with the National Association of Securities Dealers Regulation, Inc. As such, a deal to split the commissions that Strauss earned for Bitz's stock trading was prohibited under applicable law. Schrichte asserts that he was not seeking to split brokerage commissions, which he concedes would have been improper. Instead, he argues that he is seeking his share of the "finder's fee" for introducing Strauss to Bitz.

In addition to trading with Patrick Strauss at the brokerage firms, Bitz also invested in the hedge funds of clients of the Strauss family-owned Icon entities.[1] According to Schrichte, once Patrick

---

1. Patrick Strauss, his father appellant Michael Strauss, and his wife Mary Strauss principally owned and operated Icon. In 2001, Patrick Strauss sold and transferred all of his rights in Icon to Michael Strauss, who then became the president. Later, Icon went through mergers into several different entities: Icon International, LLC, Icon Investment Group, Inc., Icon International Group, Inc., the Icon Group, LLC (collectively referred to hereafter as the "Icon entities"), and, the sole remaining entity, PEP.

Strauss began to cultivate Bitz as a client, Strauss pressed Schrichte to change the compensation split for the "consulting fees" earned from Bitz's investments from a 60/40 split to a 50/50 split. Schrichte claims that he and Patrick Strauss orally agreed to change the compensation split, but never reduced the change to writing. According to Schrichte, the change was made pursuant to the language in the November 19th memorandum stating that: "Future deals you originate will be split on a case by case basis." Patrick Strauss denies the existence of the alleged oral agreement and the subsequent modification.

Three years after the Tyson's Corner lunch meeting, Patrick Strauss paid Schrichte $125,000. The parties dispute the purpose of this payment. According to Schrichte, Patrick Strauss told him that Bitz's investments into the hedge funds of MassMutual, one of the Icon entities' clients, earned Strauss $250,000 in consulting fees. Therefore, the $125,000 represented NewMarket's 50% share under the modified oral agreement. Patrick Strauss contends that the $125,000 payment was "go-away" money because Schrichte threatened to report the brokerage commission payments that Strauss split with Schrichte to Strauss' employer. Additionally, Strauss said he feared that Schrichte would disclose to Strauss' employer that he was "moonlighting," or negotiating side deals, with Icon. After receiving the $125,000 payment, Schrichte suspected that his 50% share should have been more, so he repeatedly requested documentation about the total amount that the Icon entities received from Bitz's investments. Schrichte alleges that Patrick Strauss eventually disclosed to him that Bitz invested a total of $35 million through multiple installments into the MassMutual hedge funds, and that these Bitz investments yielded solicitor's fees to Strauss

and the Icon entities totaling approximately $975,000.

Schrichte and NewMarket filed suit against Patrick Strauss, Mary Strauss, Michael Strauss, and all six Icon entities, seeking to enforce what Schrichte contends was the oral agreement to split 50/50 any compensation earned from Bitz's investments. Schrichte sought an accounting of the compensation the Icon entities received from the Bitz investments and a declaratory judgment that the oral agreement was an enforceable contract entitling Schrichte to 50% of the estimated compensation earned from the Bitz investments. Additionally, Schrichte sought recovery for: breach of contract, breach of covenants of good faith and fair dealing, breach of fiduciary duty, quantum meruit/restitution, estoppel, unjust enrichment, and fraud. The parties filed cross motions for summary judgment, which were both denied.

The case proceeded to a bench trial. Both Patrick Strauss and Schrichte testified about the Tyson's Corner lunch meeting and their correspondence afterwards. Mary Strauss testified about her e-mail correspondence with Schrichte leading up to the $125,000 payment. Additionally, appellants' expert witness, Adam Kreisel, testified about finder or solicitor's fee agreements and sub-finder's fee agreements. According to Kreisel, Schrichte was seeking compensation under an alleged sub-finder's agreement, because he wanted a percentage of the finder's fee Strauss received from MassMutual for securing Bitz's investments into MassMutual's hedge funds. Kreisel testified that the starting point for splitting finder's fees with a sub-finder is usually 10–15%. Further, Kreisel testified that he had never seen an oral sub-finder agreement because the custom and practice in the brokerage industry are to comply with the Invest-

ment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 to b–21 (2006), which requires putting sub-finder's fee agreements into writing. Kreisel explained that under the statute, all of the parties earning fees must be disclosed to the investor.

The trial court found that "an oral agreement existed among the parties," and issued a written Bench Order and Opinion ("Order") dated January 17, 2008. The trial court found that the November 19th memorandum "memorialized" the oral agreement that Patrick Strauss and Schrichte entered into at the Tyson's Corner lunch meeting. Further, the trial court found that the total amount of the "consulting fees" received by Strauss from Bitz's multiple investments was $990,000. The trial court reasoned that the $125,000 payment did not amount to 50% of the "consulting fees," which it found Strauss had agreed to pay Schrichte. The trial court also found the small payments, which Patrick Strauss claimed were illegal stock commission splits paid out of gratitude, to be "periodic payments" generated by stock commissions earned from Bitz's investments, which Patrick Strauss paid Schrichte "as he had promised to do." Based on Kreisel's testimony, the trial court found that the agreement to split "finder's fees" was not illegal and that oral finder's fee agreements are enforceable. The trial court was "not convinced that the $125,000 payment to [Schrichte] was 'go away money,'" as Patrick Strauss claimed. Concluding that Patrick Strauss had "held out Icon Insurance Group, Inc. as an alter ego of himself and commingled its funds with his own personal funds," the trial court entered judgment against Patrick Strauss in his personal capacity for $370,-000—50% of the $990,000 it determined were fees generated by the Bitz investments minus the previous $125,000 payment—plus pre-judgment interest. However, the trial court did not find Michael Strauss liable because "he merely acquired Icon from Patrick Strauss and had nothing to do with NewMarket, Mr. Schrichte, or the Bitz transactions." Nor did it find Mary Strauss liable because her involvement was "limited."

Appellant Michael Strauss, in his capacity as President of PEP, filed a counterclaim against Schrichte and NewMarket for breach of an oral accord and satisfaction and interference with an advantageous economic relationship arising out of PEP's attempt to merge with an online gaming venture in Ireland. Michael Strauss asked Schrichte to forgo filing his claim against PEP because the litigation threatened the pending merger. According to Michael Strauss, the $125,000 wire transfer constituted performance under the oral accord and satisfaction, and Schrichte breached the agreement when he filed this lawsuit. As a result, PEP was unable to complete the planned merger with the foreign company. The trial court dismissed the counterclaim with prejudice in a written order, determining that "there were insufficient facts to support these claims." The appeal from the dismissal of the counterclaim was consolidated with Patrick Strauss' appeal before this court.

## II.

### A.

■■■■ The determination of whether an oral contract exists as an enforceable agreement is a question of law, which we review *de novo*. *See Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005). Enforceable oral contracts require both an agreement as to all the material terms and an objective manifestation of the parties' intent to be bound by the oral agreement. *See New Econ. Capital, LLC v. New Markets Capital Grp.*, 881 A.2d 1087, 1094 (D.C.2005) (citing *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d

1236, 1238 (D.C.1995)).[2] The two requirements are closely intertwined because even if the parties intend to be bound by an agreement, the court must be able to determine the terms of the agreement before it can enforce them.[3] We have declined to uphold oral contracts in cases where critical details of the proposed transaction could not be proved. *See, e.g., Stansel v. Am. Sec. Bank*, 547 A.2d 990, 993 (D.C.1988) (finding no enforceable contract where parties failed to offer "evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance"). However, the determination of what the parties consider to be the material terms of their agreement is a question of fact. *See Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C.1985). We may only reject the trial court's findings of fact if they are "clearly and manifestly wrong" or without evidence to support them. *Id.* The party asserting the existence of the oral contract has the burden of proving that an enforceable agreement exists. *See Kramer Assocs., supra*, 888 A.2d at 251; *Jack Baker, Inc., supra*, 664 A.2d at 1238. When the party seeking to enforce the contract fails to prove the material terms[4] that are "necessary for the parties to understand how they are expected to perform the contract itself," the agreement cannot be binding. *Duffy, supra* note 4, 881 A.2d at 636.

■ We conclude that the trial court erred in finding that an enforceable oral agreement to split brokerage commissions, consulting fees, or finder or solicitor's fees existed. The trial court relied on the November 19th memorandum and concluded that it "memorialized the agreement" entered into at the Tyson's Corner lunch meeting. In reaching its conclusion, the trial court focused on the parties' intent to be bound by the agreement. The trial court reasoned that "when the parties to a contract set forth the terms of their agreement in writing and manifest in some manner a clear intent to be bound, the absence of one party's signature on the written agreement will not defeat or invalidate the contract," and concluded that "despite Defendants' contentions, the [c]ourt is persuaded by the evidence presented at trial and the law that an oral agreement existed among the parties."

2. Contracts are not required to be in writing unless the statute of frauds applies. *See Kramer Assocs., Inc., supra*, 888 A.2d at 252. We agree with the trial court's conclusion that because this contract was capable of being performed within one year, the statute of frauds is inapplicable. *See Launay v. Launay, Inc.*, 497 A.2d 443, 449 n. 4 (D.C.1985).

3. A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are.

1 Joseph M. Perillo, CORBIN ON CONTRACTS § 4.1, at 525 (rev. ed. 1993); *see also Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 369–70 (D.C.1990).

4. *See Duffy v. Duffy*, 881 A.2d 630, 636 (D.C. 2005); *see also New Econ. Capital, LLC, supra*, 881 A.2d at 1096 (finding no enforceable oral contract where the parties did not agree on the terms of payment, nor whether consulting services should be rendered). Examples of terms that we have recognized as material under certain agreements include "subject matter, price, payment terms, quantity, quality, and duration." *See Rosenthal, supra*, 573 A.2d at 370; *see also New Econ. Capital, LLC, supra*, 881 A.2d at 1096; *Georgetown Entm't Corp., supra*, 496 A.2d at 590.

The terms of the alleged oral agreement were not memorialized in an enforceable manner. *See Rosenthal, supra,* 573 A.2d at 370 ("Reasonable definiteness in the essential terms of a purported contract must . . . be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce."). We previously recognized that a written agreement can memorialize an oral agreement if the document is understood as a "mere memorial" of the oral agreement that the parties already reached, but no oral contract exists if the document is to contain any material term that the parties did not previously agree upon. *Jack Baker, Inc., supra,* 664 A.2d at 1239 (quoting *D.C. Area Cmty. Council v. Jackson,* 385 A.2d 185, 187

(D.C.1978) (per curiam)). Here, we cannot say that the November 19th memorandum is a mere memorial of the oral agreement that the parties already reached because the document contains disputed terms. Regarding subject matter, the memorandum mentions fees, but is silent as to whether the alleged agreement was to split brokerage commissions, finder or solicitor's fees, consulting fees, or other unspecified fees— a major point of contention among the parties.[5] Moreover, the memorandum fails to set forth the duration of the contract or the scope of the transactions covered by the agreement.[6]

Although the trial court specifically found that Patrick Strauss was liable to Schrichte for 50% of the consulting fees he

**5.** The trial court concluded oral agreements concerning finder's fees are enforceable without determining whether the fees at issue in this case could be characterized as finder's fees. The nature of the fees is significant for the purpose of enforceability because Schrichte conceded in testimony that it would have been improper for Strauss to split brokerage commissions with him. Even if the fees could be characterized as finder's fees, Strauss' expert, Kreisel, testified that he had never seen a finder's fee agreement drafted like the November 19th memorandum because the custom and practice are to comply with the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 to b–21 (2006), which requires putting sub-finder's fee agreements into writing. Here, the memorandum did not identify the investors covered by the agreement or the duration of the agreement, and it was only signed by one party. An SEC rule, 17 C.F.R. § 275.206(4)–3 promulgating the Investment Advisers Act of 1940 supports Kreisel's testimony. In particular, an SEC registered investment adviser firm may pay cash referral fees to a third-party that solicits investment adviser clients on behalf of the registered investment adviser firm only if the solicitor referral arrangement between the investment adviser and third-party solicitor is in writing and includes certain provisions. SEC Investment Advisers Act of 1940 Rule, 17 C.F.R. § 275.206(4)–3(a)(2)(iii)(A) (2010). These provisions include: (1) the solicitation

activities to be engaged in by the solicitor on behalf of the investment adviser and the compensation to be received therefor; (2) an undertaking by the solicitor to perform such activities consistent with instructions of the investment adviser and in compliance with the Investment Advisers Act of 1940, and rules thereunder; and (3) an undertaking by the solicitor to provide the client with additional written documents, including separate solicitor and investment adviser disclosures, at the time of any solicitation activities for which compensation is paid or to be paid by the investment adviser. *Id.*

**6.** This is significant for determining enforceability because according to Kreisel, an agreement to split finder's fees between Strauss and Schrichte would have been voidable due to the failure to disclose potential conflicts of interest to Bitz. Again, the SEC rule, 17 C.F.R. § 275.206(4)–3, states that the third-party solicitor must provide the client with separate written disclosures from both the solicitor and investment adviser. Furthermore, the rule states that prior to, or at the time of, entering into any written or oral investment advisory contract with the client, the investment adviser needs to receive a signed and dated acknowledgment of receipt of the separate written disclosure statements from the client. 17 C.F.R. § 275.206(4)–3(a)(2)(iii)(B).

received from the Bitz investments, it failed to conclude that the parties agreed to this fee arrangement. Even if the court had reached this conclusion, the memorandum lacked the terms of this particular agreement and thus could not memorialize a prior oral agreement to such terms. First, the November 19th memorandum does not refer to any transaction involving Bitz, nor does it mention a 50/50 split of fees earned from his investments. This is due to the fact that the November 19th memorandum was drafted before Schrichte introduced Bitz to Patrick Strauss. Second, the language in the memorandum, which states that: "Future deals you originate will be split on a case by case basis," is too vague and indefinite to allow us to conclude that the payment terms of the agreement were to split fees 50/50. Finally, no other writings exist memorializing the oral modification, which allegedly changed the fee split agreement from 60/40 to 50/50 after Bitz began trading with Patrick Strauss.

■ Despite the lack of evidence supporting the existence of an enforceable oral agreement to split fees, Schrichte maintains that the November 19th memorandum had sufficient language to support a future agreement to split fees 50/50 in the Bitz investments.[7] To support his argument, Schrichte relies on the vague and indefinite language in the memorandum stating that "[f]urther compensation on NCG originated deals will be agreed to on a case by case basis," and "[f]uture deals you originate will be split on a case by case basis." This language cannot be enforced. To be enforceable, a contract to enter into a future contract must specify all its material terms and leave none to be agreed upon. *See Jack Baker Inc., supra,* 664 A.2d at 1239. The "contract to make a contract" language from the November 19th memorandum upon which Schrichte relies is insufficient to establish that the parties agreed on material terms for the Bitz transactions. *Id.* Without more detail about the material terms such as the duration of the agreement, subject matter, and terms of payment, the "case by case basis" language found in the November 19th memorandum is merely an agreement to negotiate in the future. It cannot be interpreted as an enforceable term requiring the parties to split 50/50 the fees earned from Bitz's investments.

■ Additionally, Schrichte argues that the existence of the alleged oral agreement can be shown through the parties' actions. Specifically, he argues that the $125,000 paid by Strauss was performance under the oral contract and thus demonstrates that Strauss agreed to split 50/50 the fees that he earned from Bitz's investments. However, the evidence does not support this argument. The e-mail correspondence between Schrichte and Mary Strauss leading up to the $125,000 wire transfer fails to show that the Strausses were acting in furtherance of the contract or that there was a mutual agreement to the material terms of the alleged oral agreement. For example, in an April 3, 2001 e-mail to Mary Strauss, Schrichte requested that she wire "half of the finder's fee" to him. Mary Strauss responded that "[w]hen I send the wire to you per the instructions you sent, I will send a confirmation letter to you stating the amount and that it is the fee for the consultation services your company provided during the first quarter of 2001." In a subsequent e-mail, Schrichte stated, "I spoke to [Patrick Strauss] a couple of times this week and he indicated that you and he had been assured that the funds for the Bitz finder's

---

**7.** At oral argument, Schrichte's counsel stated that the parties reached an oral contract regarding Bitz in December 1998 subsequent to the November 19th memorandum. However, this is not reflected as a finding of fact in the trial court's order.

fee would flow this week. I really hope that you can turn our [NewMarket's] half of the fee around the same day as you receive the fee." Patrick Strauss denies that he ever agreed to pay Schrichte 50% of the fees he earned from Bitz's investments with MassMutual. While these e-mails may show Schrichte expected 50% of the fees the Strausses were to receive from Bitz's investments, the e-mails give no indication that appellants agreed that the $125,000 represented a 50/50 split of such fees. To the contrary, the e-mail from Mary Strauss characterizes the $125,000 as a "consulting fee" and never mentions that the amount is half of the fees received from Bitz's investments. In fact, Mary Strauss testified that she did not respond to Schrichte's inquiries regarding the amount of the fees earned from Bitz's investments because, "I knew he wasn't getting [fifty] percent, but [ ] in my head I was just trying to coast along and not make him agitated until we could pay him because I hoped then this would be over."

We are unpersuaded by Schrichte's contention that the $125,000 payment constitutes Patrick Strauss' performance under the oral agreement and therefore manifests his intent to be bound by the agreement. In *Kramer Associates*, we held that no enforceable agreement existed when there was conflicting evidence about the purpose of a $75,000 transfer made by the appellees, which the appellants claimed was performance under the agreement. 888 A.2d at 253. Similarly, here the parties presented conflicting evidence about the purpose of the $125,000 transfer appellants made to Schrichte. According to Schrichte, the money was Patrick Strauss' performance under the agreement—50% of the consulting fees earned from Bitz's investments with MassMutual. On the other hand, Patrick Strauss claims that Schrichte threatened to tell Strauss' brokerage firm that he was moonlighting for the Icon entities and splitting his brokerage commissions if he did not pay Schrichte $125,000 in "go-away" money. Adding even more confusion to the purpose of the transfer, Michael Strauss alleges in the counterclaim and again on appeal, that the $125,000 payment was made pursuant to an accord and satisfaction obligating Schrichte not to file this suit. Given the ambiguity surrounding the $125,000 payment appellants made to Schrichte, the payment itself is insufficient to establish Patrick Strauss' performance under the oral agreement and his intent to be bound by the alleged oral agreement.

The conflicting actions of the parties, coupled with the murky facts surrounding the alleged oral agreement, lead us to conclude that no enforceable oral contract existed. While the absence of a written contract is not dispositive, it does cast doubt on whether the parties agreed to all of the material terms and agreed to be bound by any agreement. Further, the lack of a written agreement raises serious questions as to why experienced businessmen engaged in a complex business transaction did not clarify in writing exactly what the subject matter, scope, duration, and terms of the agreement were. Schrichte, therefore, fails to meet his burden of proving the material terms of the oral agreement and that Patrick Strauss intended to be bound by the alleged oral agreement. *See Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C.1981) ("In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract."). Accordingly, we conclude that no enforceable oral contract existed between the parties.[8]

8. Because we find that no enforceable contract existed as a matter of law, we do not reach or address Patrick Strauss' claims that the trial court erroneously pierced the corpo-

## B.

As to appellants' argument that the trial court erred in dismissing appellant Michael Strauss' counterclaim on the grounds that the court did not make any findings of fact, we reverse and remand to the trial court with instructions to reinstate the counterclaim. In an April 30, 2008 written order, the trial court dismissed the counterclaim with prejudice on the grounds that there were insufficient facts to support it. The April 30, 2008 order referenced the reasons stated in the court's January 17, 2008 order, where it found that an enforceable contract existed between Patrick Strauss and Schrichte. Specifically, in its January 17th order, the trial court rejected Patrick Strauss' contention that the $125,000 was "go-away" money and found that the payment was performance under the oral agreement between Patrick Strauss and Schrichte. The trial court rejected Michael Strauss' argument that the $125,000 payment was made pursuant to an oral accord and satisfaction obligating Schrichte not to file this suit. However, because we reverse the trial court's determination that an enforceable contract existed between Patrick Strauss and Schrichte and are unpersuaded that the $125,000 payment constitutes Patrick Strauss' performance under the oral agreement, we cannot affirm the trial court's dismissal of Michael Strauss' counterclaim with prejudice. Therefore, we reverse and remand to the trial court with instructions to reinstate the counterclaim consistent with this opinion. *Cf. Harrington v. Trotman*, 983 A.2d 342, 348 (D.C. 2009); *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 440–41 (D.C.2007) (reversing trial court's ruling that contract lacked consideration and remanding to determine suit for specific performance).

## III.

Accordingly, we hold that no enforceable contract existed between the parties due to the oral nature of the agreement, coupled with the murky and conflicting evidence as to the material terms of the agreement. We therefore reverse the trial court's judgment finding Patrick Strauss liable for breach of contract. We also reverse the trial court's decision to dismiss the counterclaim against Schrichte and NewMarket and remand for further proceedings consistent with this opinion.

*So ordered.*

---

rate veil to find him personally liable, that appellees' claims were barred by the statute of limitations, or that the trial court erred in calculating damages.