UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                             )

SALAH N. OSSEIRAN,        )

                        )

      Plaintiff,       )

                        )

      v.            )      Civil Action No. 06-336 (RWR)

                        )

INTERNATIONAL FINANCE    )      UNSEALED
CORPORATION,         )

                        )

      Defendant.      )
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiff Salah Osseiran brings claims for promissory estoppel and breach of a confidentiality agreement against the International Finance Corporation ("IFC"), alleging that IFC failed to sell to Osseiran its shares of the Middle East Capital Group ("MECG") after representing that it would do so, and that IFC divulged Osseiran's potential share purchase to an unauthorized party.[1]  IFC has moved for summary judgment on both claims.  Because Osseiran has not shown that genuine issues of material fact exist regarding the elements essential to his claim for promissory estoppel and because IFC is entitled to judgment,

---

[1] Osseiran's claim for breach of contract was previously dismissed under Federal Rule of Civil Procedure 12(b)(6), see Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139, 146-147 (D.D.C. 2007), and his motion for reconsideration of the dismissal was denied.  IFC's claim that it was immune from suit also was denied.  Id. at 143-145, aff'd, 552 F.3d 836 (D.C. Cir. 2009).

IFC's motion will be granted as to that claim.  However, because Osseiran has presented evidence that the parties entered into an enforceable confidentiality agreement, and whether a breach of that agreement occurred remains in dispute, IFC's motion will be denied as to the claim for breach of that agreement.

## BACKGROUND[2]

Osseiran is a shareholder in the Middle East Capital Group ("MECG").  In the summer of 2005, he sought to gain a controlling stake in MECG by purchasing the shares held by IFC, an international organization and private arm of the World Bank, and by Barclays Capital, among other shareholders.  Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139, 142 (D.D.C. 2007).  IFC, acting on behalf of itself and Barclays Capital, and Osseiran negotiated for IFC to sell Osseiran its MECG shares, but IFC ultimately sold its shares to a third party.  Id.

The summary judgment filings set forth the following facts that are material to Osseiran's claims arising from those negotiations and as to which there is no genuine dispute.  On September 5, 2005, Osseiran called Jan van Bilsen, an IFC investment manager, and expressed interest in buying IFC's and Barclay's shares in MECG.  Osseiran asked van Bilsen to keep their negotiations confidential, and van Bilsen verbally agreed.

---

[2] The background of this case is discussed more fully in Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139 (D.D.C. 2007).

(Def.'s Mot., Ex. 1, van Bilsen Decl. ¶¶ 1, 3; Ex. 5, van Bilsen Dep. 21:12-14, 23:21-24:2.)  Van Bilsen stated that he agreed to keep the negotiations confidential because "that's what we always do with our clients."  (Id. 24:4-5.)  After the phone call, van Bilsen sent an e-mail to a colleague at IFC, relating the conversation and explaining that "[Osseiran] approaches us first and said it must be treated very confidentially."  (Pl.'s Opp'n, Ex. 12.)  Later in the e-mail, he reiterated that "Osseiran stressed confidentiality and I told him we will treat it accordingly . . . ," and he concluded the e-mail with a short section entitled "Next Steps" that stated "[w]e should look into this seriously and ensure there are no reputation/corp governance issues with us selling to Osseiran quietly.  Please handle and discuss. . . .  Keep it confidential."  (Id.)

On October 3, 2005, Osseiran sent an e-mail to van Bilsen formally presenting to IFC Osseiran's offer to purchase all of IFC's MECG shares.  (Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex. 19; id., Ex. 8, Osseiran Dep. 124:17-126:2.)  The e-mail had two parts, the first setting forth the "Conditions" of the offer, and the second setting forth the "Terms."  "Ultimate confidentiality of this offer" appeared under the "Conditions" heading.  (Def.'s Mot., Ex. 19.)  The "Terms" heading included the proposed

purchase price of the shares and the terms of payment. (Id.)[3] The parties agreed on the terms of the purchase and Osseiran sent an e-mail to van Bilsen on November 18, 2005 purporting to "confirm" the agreement. (Def.'s Mot., Ex. 12.) Van Bilsen responded the same day asking Osseiran to "confirm" that Osseiran "accept[ed] that [IFC's] acceptance is subject to documentation -- meaning separate sales agreements," along with additional bank guarantees. (Id.; Def.'s Mot., Def.'s Stmt. of Material Facts Not in Dispute ("Def.'s Stmt.") ¶ 18.) Van Bilsen's e-mail also asked for confirmation of Osseiran's understanding that the "sales agreements come into force and affect" only after execution of the agreements and receipt of the guarantees. (Def.'s Mot., Ex. 12.) IFC's investment managers lack authority to finalize transactions with third parties to buy or sell investments without executed documentation. (Def.'s Stmt. ¶ 8.) In a November 19, 2005 response to van Bilsen, Osseiran expressly accepted these conditions. (Id. ¶ 18; Osseiran Dep. 152:20-153:6.)

Van Bilsen forwarded a draft sales agreement to Osseiran on November 26, 2005 that stated on its face that the parties did not intend to be bound until the execution of a final contract. The draft provided:

---

[3] Osseiran conceded that IFC never accepted the offer embodied in the e-mail. (Osseiran Dep. 126:3-13.)

> [t]his draft document is not a contract or an offer to enter into a contract. Only the document as executed by IFC and Mr. Osseiran will contain the terms that bind them. Until the document is executed by IFC and Mr. Osseiran, neither IFC nor Mr. Osseiran intends to be bound.

(Def.'s Mot., Ex. 13.) IFC officials informed Osseiran via a telephone call on December 19, 2005 that IFC had decided to suspend its sale of IFC shares to Osseiran. (Def.'s Stmt. ¶ 22.) Osseiran stated that during the call, an IFC representative "informed [him] that because of the complaints of other MECG shareholders IFC had decided to suspend, place on hold or delay the closing of the transaction by which IFC was to sell its MECG shares to [him]." (Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Decl. of Salah N. Osseiran ("Osseiran Decl.") ¶ 1.) Osseiran stated that, both in that conversation and afterwards, IFC representatives "repeatedly assured [him] that IFC still intended to sell its MECG shares to [him] and was not soliciting other buyers, but that, for political reasons, [IFC] needed to first confirm that it did not need the approval of the other MECG shareholders to sell its shares." (Id. ¶ 2.) In his deposition, Osseiran stated that the day after receiving notice that IFC was suspending the sale, Barclays contacted him in order to "pursue the deal that IFC broke." (Osseiran Dep. 43:20-44:6.) In an e-mail he sent to van Bilsen on December 22, 2005, Osseiran "invite[d] [van Bilsen] to sign immediately the 'Share sale agreement' that has been negotiated, proposed, and drafted by

IFC" and "urge[d] [him] to conclude the agreement[.]" (Def.'s Mot., Ex. 15.)

Thereafter, Osseiran entered agreements to purchase MECG shares from other shareholders. Later in December, he agreed upon language for a formal stock purchase agreement with Barclays and concluded the agreement on January 9, 2006. (Osseiran Dep. 42:12-43:1.) He entered into an agreement to purchase shares from Financial Investment Luxembourg on December 31, and made additional agreements with other shareholders over the following months. (Id.; Def.'s Mot., Ex. 17, Pl.'s Supp. Resps. to Def.'s First Set of Interrogatories at 3 (listing date, seller, share amount, and price for Osseiran's purchases of MECG shares).) Osseiran and IFC never finalized or executed a sales agreement and IFC never sent Osseiran a signed stock transfer form, which was necessary to complete a sale of IFC's MECG shares. (Def.'s Stmt. ¶ 20.) Osseiran eventually sold the other MECG shares he purchased at higher prices than those he paid to obtain them. (Id. ¶ 37.)

Osseiran's amended complaint alleges that IFC committed a breach of the confidentiality agreement by telling the MECG chair in December of 2005 that Osseiran was buying MECG shares from IFC and Barclays (Am. Compl. ¶¶ 27, 48), and IFC's answer denies the allegation (Ans. ¶¶ 27, 48). The parties have neither discussed nor resolved this dispute in their briefs.

DISCUSSION

Summary judgment is warranted upon a showing that "there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury considering the evidence could return a verdict in favor of the nonmoving party. Holcomb, 433 F.3d at 895. A fact is "material" where "a dispute over it might affect the outcome of a suit under the governing law." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, a court should draw all "justifiable inferences" in favor of the nonmovant, Liberty Lobby, 477 U.S. at 255, and "eschew making credibility determinations or weighing the evidence," Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). However, "[t]he nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'" Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). The nonmoving party must demonstrate that there is sufficient evidence requiring the claimed factual dispute to be resolved by a jury or judge at trial. Moore, 571 F.3d at 66. Facts identified by the moving party in its statement of material facts are deemed admitted unless

controverted by the nonmovant in its statement of genuine issues filed in opposition.  Local Civ. R. 7(h)(1).

I.   PROMISSORY ESTOPPEL

In order to prevail on a promissory estoppel claim, a plaintiff must establish "(1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his detriment."  Daisley v. Riggs Bank, 372 F. Supp. 2d 61, 71 (D.D.C. 2005); Novecon, Ltd. v. Bulgarian-Am. Enter. Fund, 967 F. Supp. 1382, 1388 (D.D.C. 1997) ("Under a theory of promissory estoppel, [the plaintiff] must be able to show that it relied *reasonably* on the promises given by [the defendant].")  Under District of Columbia law, when the plaintiff advances a promissory estoppel claim, the absence of an express, enforceable contract is presumed.  Bldg. Srvcs. Co. v. Nat'l R.R. Passenger Corp., 305 F. Supp. 2d 85, 95 (D.D.C. 2004)).  However, because reliance on an indefinite promise is unreasonable, a promissory estoppel claim must rest on "a promise with definite terms on which the promisor would expect the promisee to rely." In re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 58, 73 (D.D.C. 2003); Novecon, Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 565 (D.C. Cir. 1999) ("Although 'for purposes of estoppel, a promise need not be as specific and definite as a contract, . . . in the final analysis there must be a promise' -- and it must be more than merely a promise to 'bargain in good

faith.'") (quoting <u>Bender v. Design Store Corp.</u>, 404 A.2d 194, 196-97 (D.C. 1979)). The promissory estoppel theory is an "inherently equitable doctrine," <u>Moss v. Stockard</u>, 580 A.2d 1011, 1035 (D.C. 1990), that "may be invoked only when injustice otherwise would not be avoidable," <u>Kauffman v. Int'l Bhd. of Teamsters</u>, 950 A.2d 44, 49 n.7 (D.C. 2008) (internal quotation marks and alterations omitted).

Osseiran has not proffered evidence on which a reasonable jury could find that he relied reasonably on an IFC promise to execute the share deal. "A promise is 'an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, *communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon*.'" <u>Choate v. TRW, Inc.</u>, 14 F.3d 74, 77-78 (D.C. Cir. 1994) (quoting 1 CORBIN ON CONTRACTS § 13 (1963)) (emphasis added). A promise to do something does not reasonably induce reliance where, as here, the promissor repeatedly and expressly conditions fulfilling the promise on the execution of formal documentation. In <u>Bender</u>, a promissory estoppel action to enforce an alleged promise to lease commercial space from the plaintiffs, the D.C. Court of Appeals found no sufficiently definite promise where a defendant's "direct statements that there existed no binding lease were sufficient to negate any inference that [it] had made such a

promise," because "[t]hrough two letters sent in the early stages of negotiations, [the defendant's] agents made it clear that *absent execution of a formal lease agreement*, they intended no binding commitment to lease." Bender, 404 A.2d at 196; see also Doll v. Grand Union Co., 925 F.2d 1363, 1372-73 (11th Cir. 1991) (affirming summary judgment for defendant on promissory estoppel claim where defendant had given "repeated caveats that it did not intend to be bound until a final lease agreement was signed"). Like what occurred in Bender, the defendant here made it clear on the face of the draft sales agreement that "*[o]nly the document as executed* by IFC and Mr. Osseiran will contain the terms that bind them." (Def.'s Mot., Ex. 13 (emphasis added).) Osseiran acknowledges that the draft share purchase agreement states that the parties did not intend to be bound until the document was executed, but contests the significance of this fact, arguing that "th[e] statement was made only by IFC and was made after the date on which Osseiran contends a binding agreement was reached." (Pl's Opp'n, Pl.'s Statement of Material Facts ("Pl.'s Stmt.") ¶ 2.) As is noted above, Osseiran's contract claim, that a "binding agreement" was reached and then breached, was earlier dismissed for failure to state a claim. Osseiran, 498 F. Supp. 2d at 146-147. Further, Osseiran's contention that the statement of intent not to be bound "was made only by IFC" misunderstands the promissory estoppel inquiry. The express statement by IFC

that it would consider itself bound only by an executed document put Osseiran on notice that the agreement was preliminary. It thus undercuts the reasonableness of his relying on IFC's promises to finalize the sale.

Moreover, even if the draft agreement's language were insufficient to notify Osseiran that the agreement was not binding, IFC's communication on December 19, 2005 that it was suspending the sale clearly alerted Osseiran to the fact that IFC did not consider itself bound. Notably, Osseiran did not begin to purchase additional MECG shares from other shareholders until December 31, 2005, *after* he learned of IFC's suspension of their potential sale. As evidence that he reasonably believed the sale was imminent, Osseiran cites repeated reassurances from IFC representatives that the sale was placed on hold merely in order to resolve whether IFC needed approval from other MECG shareholders and in order to secure confirmation from shareholders that IFC was free to sell its shares. (Osseiran Decl. ¶¶ 1-5; Pl.'s Opp'n at 4 ("IFC's own documents support Osseiran's assertion that, during the suspension period, IFC intentionally and repeatedly led [Osseiran] to believe that IFC would fulfill its promise to sell its MECG shares to him upon the remaining shareholders' confirmation that IFC was free to sell its shares.").) These assurances, however, communicate IFC's determination that it needed to resolve outstanding issues and

confirm its authority before proceeding.  On this backdrop, no reasonable jury could find Osseiran relied reasonably on the draft sales agreement in order to proceed with his bid to gain a majority stake.  See, e.g., Novecon, 967 F. Supp. at 1388 (finding reliance unreasonable where the plaintiff acted "in reliance on a 'promise' that was expressly conditioned on ratification by the . . . Board of Directors").  Osseiran himself characterizes the situation as one in which IFC "understandably wanted to keep *the option* of selling to Osseiran open," and notes that "IFC continued its policy of *keeping its options open* until at least February 14, 2006, just prior to the February 16, 2006 shareholders' meeting after which IFC agreed to sell its shares to a third party."  (Pl.'s Opp'n at 5 (emphasis added).)  In sum, Osseiran has failed to establish a triable issue that IFC made a definite promise that reasonably induced him to rely to his detriment.[4]

---

[4] The parties also dispute whether Osseiran suffered any detriment by relying on IFC's promise.  IFC argues that no detriment resulted because Osseiran realized a profit when he sold the MECG shares he had purchased from other shareholders in his bid to gain a majority stake.  (Def.'s Mem. of P. & A. in Supp. of Mot. Summ. J. ("Def.'s Mem.") at 9.)  Osseiran counters that the detriment was not limited to his purchase of additional shares but also his "refraining from purchasing shares that would have offset those that IFC refused to sell to him."  (Pl.'s Opp'n at 6.)  Osseiran also alleges that he "was forced to pay a higher price for the stock that he purchased from other MECG shareholders."  (Am. Compl. ¶ 49.)  Because the finding that Osseiran's reliance was not reasonable defeats his claim for promissory estoppel, the existence of detriment need not be addressed.

II.  BREACH OF CONFIDENTIALITY

Osseiran alleged that the parties agreed in September 2005 that their negotiations were to be kept confidential.  (Am. Compl. ¶ 21.)  In order to establish an enforceable agreement under District of Columbia law, the parties both must (1) agree on all material terms and (2) intend to be bound.  Perles v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007); Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247, 251 (D.C. 2005).  "The two requirements are closely intertwined because even if the parties intend to be bound by an agreement, the court must be able to determine the terms of the agreement before it can enforce them." Strauss v. NewMarket Global Consulting Group, LLC, 5 A.3d 1027, 1033 (D.C. 2010).  "While a 'meeting of the minds,' or mutual assent, 'is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of a contract.  The parties' acts at the time of the making of the contract are also indicative of a meeting of the minds.'"  Kramer Assocs., 888 A.2d at 252 (quoting Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995)).  In addition, "an express contract requires an offer and acceptance, and must be supported by consideration."  Ghahremani v. Uptown Partners, LLC, Civil Action No. 05-1270 (CKK), 2005 WL 3211463, at *16 (D.D.C. Nov. 13, 2005).  The party asserting the existence of the

contract bears the burden of proof.  <u>Jack Baker, Inc. v. Office Space Dev. Corp.</u>, 664 A.2d 1236, 1238 (D.C. 1995).

Osseiran contends that the parties entered into a confidentiality agreement independent of the share purchase deal on or about September 5, 2005.  (Pl.'s Opp'n at 7.)  IFC argues that Osseiran conceded in his sworn deposition testimony that there was no separate agreement regarding confidentiality.  (Def.'s Reply at 13.)  Osseiran's memorandum in opposition to IFC's motion for summary judgment advances arguments that are in tension with Osseiran's prior statements.[5]  (<u>Compare</u> Pl.'s Opp'n

---

[5] Osseiran alternately characterizes the confidentiality agreement as a condition of Osseiran's offer to negotiate, as a condition of his offer to purchase IFC's shares, and as an independent arrangement.  Osseiran, for example, stated in his declaration that "[w]hen [he] first approached van Bilsen about the possibility of my purchasing IFC's shares in MECG, [he] made clear that [his] offer to enter into negotiations toward th[e] end [of purchasing IFC's shares] were [sic] conditioned upon IFC's agreeing to keep our discussions confidential[,]" that van Bilsen "immediately agreed to this condition," and that "both [parties] agreed to restrict knowledge of the negotiations to those persons who participated in them."  (Osseiran Decl. ¶ 8.) Osseiran stated that he "subsequently conditioned [his] formal offer to purchase the MECG shares of IFC and Barclays on the continued maintenance of confidentiality" and that "upon [IFC's] acceptance of [Osseiran's] offer, the confidentiality agreement was incorporated into the share purchase agreement."  (<u>Id.</u> ¶ 9.) IFC contends that, if the confidentiality agreement is viewed as part and parcel of the share purchase agreement, it must be found unenforceable since the sales agreement was found not to constitute an enforceable contract.  (Def.'s Mem. of P. & A. in Supp. of Mot. Summ. J. ("Def.'s Mem.") at 10.)  Osseiran maintains, however, that even though the share purchase agreement was found not to constitute an enforceable contract, the confidentiality agreement may essentially be found severable and to have "reverted to its separate form."  (Pl.'s Opp'n at 8 & n.3.)  IFC also argues that Osseiran misapprehends the legal

at 7 (arguing that "the record shows that on or about September 5, 2005 Osseiran and IFC entered into an agreement [to maintain confidentiality]") with Osseiran Dep. 124:12-16 ("Q: So what you're telling us is [t]hat it was not a separate agreement but it was part of what you believe was your agreement with IFC to purchase the shares. A: Well, the -- yes.").) Nevertheless, "[t]he determination of whether an oral contract exists as an enforceable agreement is a question of law." Strauss, 5 A.3d at 1032. While Osseiran's prior testimony evinces some confusion regarding the legal significance of various exchanges with IFC, it is not dispositive of, nor does it concede, the question of contract formation.

The record is clear that the parties had earlier discussed keeping their negotiations confidential in a telephone

---

operation of a "condition" to his offer to purchase shares. (Def.'s Reply at 12.) IFC maintains, correctly, that Osseiran's inclusion of "ultimately confidentiality" as a "condition" to his e-mail offer to purchase shares, standing alone, would not give rise to an enforceable contract, because IFC ultimately rejected Osseiran's offer to purchase shares and the draft sales agreement was found unenforceable. See Psaromatis v. English Holdings I, LLC, 944 A.2d 472, 481-82 (D.C. 2008) (explaining that "[w]hen a condition precedent has not been performed . . ., 'the rights of both parties [are] at an end'") (quoting Brier v. Orenberg, 90 A.2d 832, 833 (D.C. 1952)). IFC's arguments regarding the independent legal significance of a condition to an offer are not dispositive, however, because additional objective evidence supports the conclusion that the parties entered into a confidentiality agreement independent of the e-mail offer to purchase shares.

conversation on September 5, 2005.  Van Bilsen stated that he acquiesced in Osseiran's request for confidentiality:

> Q. But before [Osseiran] put an offer in writing, you had already discussed confidentiality, had you not?
> A. Well, yes. . . .  Yes, it was mentioned. . . .
> Q. And you informed [Osseiran] that you would treat it confidentially, the negotiations confidentially, correct?
> A. Yeah.  I said I would, as we normally do, indeed keep, we keep our business confidential.

(Van Bilsen Dep. 25:16-26:6.)  Following that conversation, van Bilsen sent an e-mail to a colleague at IFC, in which he stated that Osseiran had called and expressed interest in purchasing IFC's MECG shares.  Van Bilsen explained that "[Osseiran] approaches us first and said it must be treated very confidentially."  Later in the e-mail he explained that "Osseiran stressed confidentiality and *I told him we will treat it accordingly* . . . ."  (Pl.'s Opp'n, Ex. 12 (emphasis added).)  The e-mail concluded with a section entitled "Next Steps" that stated "[w]e should look into this seriously and ensure there are no reputation/corp governance issues with us selling to Osseiran quietly.  Please handle and discuss. . . . *Keep it confidential.*"  (Id.)

The oral communications exchanged between van Bilsen and Osseiran and the objective evidence that both parties took the confidentiality requirement seriously reflect that van Bilsen intended to be bound by his promise of confidentiality.  The

September 5 e-mail demonstrates van Bilsen's clear understanding that Osseiran expected that the negotiations not be disclosed. Van Bilsen's statement that he told Osseiran that IFC would treat the negotiations "accordingly" shows that van Bilsen assented to Osseiran's request for confidentiality. Moreover, van Bilsen's instruction to his colleague to "[k]eep it confidential" constitutes an independent action reflecting that van Bilsen intended to carry out, and to be bound, by the assurance he gave Osseiran. See Duffy v. Duffy, 881 A.2d 630, 637 (D.C. 2005) ("The intentions of parties to a contract can be found from written materials, oral expressions and the actions of the parties."). Notably absent from van Bilsen's e-mail is any hesitation or ambiguity regarding his understanding of or intent to abide by Osseiran's request for confidentiality.

IFC argues that "even if there had been some agreement, Plaintiff's failure to identify the material terms renders the alleged agreement void." (Pl.'s Reply at 13.) See Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 369-70 (D.C. 1990) (internal quotation marks omitted) (recognizing that "[v]agueness of expression, indefiniteness and uncertainty as to . . . the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract"). Osseiran contends that the terms were not vague or indefinite because van Bilsen "clearly understood that Osseiran expected that the negotiations

were not to be disclosed to persons who were not involved in them."  (Pl.'s Opp'n at 8 n.2.)

Courts that have found that vagueness of terms precluded the creation of enforceable oral contracts typically confronted contract terms considerably more complex than those at issue here.  For example, in Strauss, the court found an alleged oral contract unenforceable where is concerned "a complex business transaction," and omitted critical details regarding the parties' division of fees generated from stock investments.  Strauss, 5 A.3d at 1029.  In Bond v. U.S. Dep't of Justice, the court addressed an alleged oral contract between the plaintiff and a newspaper concerning the time, content, and focus of an article concerning a plaintiff.  The court concluded that the asserted contract's "alleged terms are indefinite at best and mutually exclusive at worst," where the plaintiff had argued that the parties had agreed the article would both exclude material "encroach[ing] upon the subject matter of the plaintiff's 'life story'" and "focus on [the plaintiff's] 'legal battle,'" which, the court concluded, "necessarily entail[ed] the discussion of parts of his life story."  Bond v. U.S. Dep't of Justice, 828 F. Supp. 2d 60, 79-80 (D.D.C. 2011).  Because a contract must possess a modicum of clarify in order "for the parties to understand how they are expected to perform the contract itself," the Bond court found the plaintiff's allegations regarding

conflicting material terms failed to plausibly establish the existence of an enforceable contract. <u>Id.</u> at 80 (internal quotation marks omitted); <u>see also</u> <u>New Econ. Capital, LLC v. New Markets Capital Grp.</u>, 881 A.2d 1087, 1096 (D.C. 2005) (finding no enforceable oral contract existed where the parties did not agree whether the defendant's consulting services should be rendered or agree on the rate of compensation for those services).

By contrast, the agreement alleged here does not concern complex terms of payment, complicated business transactions, or contain contradictory terms. Given the straightforward aim of the contract at issue here -- to preclude disclosure of the negotiations -- the parties' oral agreement is sufficiently clear as to the material terms. "Examples of terms that [the District of Columbia Court of Appeals] ha[s] recognized as material under certain agreements include 'subject matter, price, payment terms, quantity, quality, and duration.'" <u>Strauss</u>, 5 A.3d at 1033 n.4 (quoting <u>Rosenthal</u>, 573 A.2d at 370). In his deposition, Osseiran expressed the agreement in the following general terms:

> Q. . . . What do you believe were the terms of the
> confidentiality agreement?
> A. That they shouldn't -- we shouldn't, me and them,
> shouldn't really be talking about this deal to anybody until
> it is done with.
> Q. And that's the entire agreement, what you just told me?
> A. It's from A to Z, no leakage during the discussion,
> negotiation, consummation, closing.

(Osseiran Dep. 122:13-21.) Van Bilsen's understanding comported with Osseiran's basic expectation that the negotiations were to

be kept confidential. (See Van Bilsen Dep. 24:13-14 (stating that he "assume[d] [Osseiran] want[ed] to keep confidential [sic] between us."))

In the context of a straightforward agreement not to disclose business negotiations, duration and the identity of the parties privy to disclosure are the material terms. An oral agreement need not provide for every potentiality -- Osseiran does not argue, for example, that the alleged agreement contemplated or provided for the parties' ability to disclose negotiations post-closing or after negotiations have ceased. See Rosenthal, 573 A.2d at 370 (quoting V'Soske v. Barwick, 404 F.2d 495, 500 (2d Cir. 1968)) (recognizing that "'[a]ll the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to [be enforceable],'" since "[a]ll agreements have some degree of indefiniteness and some degree of uncertainty."). The agreement here is complete with regard to its duration because the parties generally understood that they were not to disclose the negotiations while they were ongoing. The bulk of the parties' negotiations occurred from early September through November 2005, and van Bilsen stated that he did not disclose the negotiations to individuals outside IFC during that period. (Van Bilsen Dep. 22:13-23:16.) At the end of November, van Bilsen sent Osseiran the draft of the share sales agreement, and then represented through the first couple

weeks of December that IFC was awaiting bank guarantees and execution of the document. (Def.'s Stmt. ¶ 7.) It was within this period of still-open negotiations that the alleged breach of the contract, by means of disclosure to MECG, occurred. (See Am. Compl. ¶ 27 ("On or about December 15, 2005, IFC's representative on MECG's Board of Directors informed MECG's chairman, who is also an MECG shareholder, that IFC had sold its MECG shares to Osseiran.").) IFC represents that it notified Osseiran that IFC had decided to suspend their deal on December 19, 2005, four days *after* the alleged disclosure of the negotiations. (Def.'s Stmt. ¶ 22.)

With regard to the parties privy to disclosure, there is no genuine dispute that keeping the negotiations confidential required that IFC *not* disclose them to individuals who were not involved in the negotiations. In an e-mail responding to Penny Walker, an official at Barclays Capital who was involved in Osseiran's proposal to purchase shares from both IFC and Barclays, van Bilsen discussed the proposed sales agreement and specifically explained that "[t]he reason why [he] ha[d] not cc-ed all is because Osseiran has stressed confidentiality to me *even within our organisations*." (Pl.'s Opp'n, Ex. 13 (emphasis added).) Because the parties agreed to refrain from disclosure to individuals not involved in their negotiations for at least the period during which the negotiations were ongoing, the oral

agreement meets the requirement "completeness." Jack Baker, 664 A.2d at 1238.

IFC also contends that the confidentiality agreement is not a valid contract because it was not supported by consideration. (Def.'s Mem. at 11-12.)  Osseiran stated that he did not give anything in exchange for the promise of confidentiality (Osseiran Dep. 123:6-12), but argues that the agreement was supported by consideration because "it was the price IFC paid for Osseiran's agreement to enter into negotiations and it was the result of the parties' exchange of promises."  (Pl.'s Opp'n at 8.)  District of Columbia courts "'will not inquire into the adequacy of' consideration, even where it is 'arguably slight,' as long as it is 'legally sufficient.'"  Washington Inv. Partners of Delaware, LCC v. Sec. House, K.S.C.C., 28 A.3d 566, 574 (D.C. 2011) (quoting Riggs v. Aetna Ins. Co., 454 A.2d 818, 821 (D.C. 1983)). "'An exchange of promises' . . . constitutes legally sufficient consideration, 'so long as it is bargained-for.'"  Id. at 574-75 (quoting Pearsall v. Alexander, 572 A.2d 113, 118 (D.C. 1990) (citing Restatement (Second) of Contracts § 75 (1932)); see also Joao v. Cenuco, Inc., 376 F. Supp. 2d 380, 384 n.4 (S.D.N.Y. 2005) (finding that a written confidentiality agreement covering discussions regarding patent acquisition and the parties' potential partnership would not be invalidated for lack of

consideration where it contained mutual promises prohibiting either party from disclosing information they discussed).

The record does not reflect extensive bargaining between the parties over the terms of confidentiality. (See Van Bilsen Dep. 25:10-12 ("It's not that [Osseiran] said I want to discuss confidentiality and we discussed it for a long period of time."); Osseiran Decl. ¶ 8 (stating that van Bilsen "immediately agreed" to keep the parties' discussions confidential when Osseiran first approached him about purchasing IFC's shares).) However, protracted discussions are not necessary to establish consideration, particularly where, as here, the terms of the agreement -- not to disclose the negotiations between IFC and Osseiran to individuals not involved in them -- are not complicated. An exchange of promises suffices so long as "[e]ach party undertook to do something it would otherwise have no legal obligation to do." Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P., 940 A.2d 996, 1004 (D.C. 2008). Here, there is evidence that IFC assented to Osseiran's request for confidentiality and Osseiran in turn agreed to enter negotiations over the purchase of IFC's shares, actions that neither party had a legal duty to perform. Moreover, the record reflects that Osseiran repeatedly emphasized and requested that the parties' negotiations be kept confidential. As is discussed above, the e-mail offer's inclusion of confidentiality, standing alone, did not create a

contract. However, it constitutes extrinsic evidence in support of Osseiran's position that he "made clear that [his] offer to enter into negotiations toward th[e] end [of purchasing IFC's shares] were [sic] conditioned upon IFC's agreeing to keep our discussions confidential." (Osseiran Decl. ¶ 8.)

In his deposition, van Bilsen stated that he viewed the agreement to keep the negotiations confidential as merely IFC's "normal business practice." (Van Bilsen Dep. 27:13.) He testified as follows:

> Q. Did you understand that you had a, an agreement with
> Mr. Osseiran to keep the negotiations confidential?
> A. Yes, but . . . in the context that we as I see
> always keep business confidential.

(Id. at 25:2-6.) A business practice and a contractual term, however, are not mutually exclusive. The parties' own agreement determines the "subject matter" of an enforceable contract. Rosenthal, 573 A.2d at 370. Where, as here, a party seeks assurances and agreement of compliance with the specific practice of maintaining confidentiality, a promissor's assent to those terms may elevate the arrangement beyond a mere professional courtesy. Osseiran requested confidentiality from IFC with regard to specific discussions regarding a proposed commercial transaction and van Bilsen, in the phone call, agreed. The fact that van Bilsen's September 5 e-mail to his colleague repeatedly mentioned the request for confidentiality and instructed the colleague to adhere to it suggests that the arrangement was not

simply business as usual.  Because the promise here was adequately bargained for, the evidence of consideration suffices as a matter of law.

In sum, Osseiran has carried his burden to present evidence of an enforceable contract, namely, that the parties agreed on the material terms of the confidentiality agreement, manifested an intent to be bound, and supported the agreement with consideration.  Thus, IFC's motion as to the breach of the confidentiality agreement claim will be denied.

### CONCLUSION AND ORDER

Osseiran has not produced evidence tending to show that he reasonably relied on an IFC promise to finalize the stock sales agreement.  He has, however, presented evidence that the parties entered into an enforceable confidentiality agreement, and whether IFC violated that agreement remains in dispute.  IFC's motion for summary judgment therefore will be granted as to Osseiran's claim for promissory estoppel and denied as to the claim for breach of a confidentiality agreement.  Accordingly, it is hereby

ORDERED that the defendant's motion [58] for summary judgment be, and hereby is, GRANTED IN PART AND DENIED IN PART.  Judgment is entered for the defendant on the plaintiff's claim for promissory estoppel.  It is further

ORDERED that the parties confer and file by September 4, 2012 a joint proposed redacted version of the Memorandum Opinion that can be filed on the public record and a joint status report and proposed order governing further proceedings.

SIGNED this 31st day of July, 2012.

                                          _____/s/_____

                                          RICHARD W. ROBERTS
                                          United States District Judge