**KRAMER ASSOCIATES, INC., and Leo Kramer, Appellants**

v.

**IKAM, LTD., Appellee.**

**No. 03–CV–1251.**

District of Columbia Court of Appeals.

Argued Dec. 13, 2004.
Decided Dec. 22, 2005.

have had serious adverse consequences for the client."

In September 2000 Ikam filed a complaint in the Superior Court against KAI and Mr. Kramer, seeking $75,000 in damages. The complaint alleged that KAI had breached its contract with Ikam by failing to raise capital for the construction project. After a non-jury trial, the court concluded that there was never a "meeting of the minds" between the parties, and thus no contract existed. Despite that fact, however, the court determined that "an unjust enrichment ... occurred, and justice and equity require that Defendant [KAI] make restitution." The court accordingly entered a judgment in favor of Ikam in the amount of $75,000. We affirm that judgment.

I

In January of 1998, Mr. Amoa–Marfo began to seek investors for a proposed housing development in Accra, Ghana. Stephen Poku–Kwateng (who is not a party to this litigation) introduced Mr. Amoa–Marfo to Mr. Kramer, who Mr. Poku–Kwateng believed would be helpful in Mr. Amoa–Marfo's endeavor to raise capital. The initial discussions took place over the telephone. On January 22, 1998, Mr. Amoa–Marfo faxed a "summary of the joint venture discussions" to Mr. Kramer, which stated that Ikam was "responsible for drawing up proposals," and that KAI was "responsible for sourcing finance for the projects." As part of the joint venture, Mr. Amoa–Marfo agreed to transfer $75,000 to KAI's bank account. Before approving the transfer, however, Mr. Amoa–Marfo traveled to the District of Columbia to meet with Mr. Kramer.

At that meeting, on March 13, 1998, Mr. Kramer offered a proposed contract which he had signed, but Mr. Amoa–Marfo did not sign it. According to Mr. Amoa–Marfo's testimony, "it was just not right. The

Howard M. Liberman, Washington, DC, for appellants.

Kenneth D. Bynum, Alexandria, VA, for appellee.

Before TERRY, Associate Judge, and BELSON and NEBEKER, Senior Judges.

TERRY, Associate Judge:

Kramer Associates, Inc. ("KAI"), is an international management consulting firm based in the District of Columbia; Leo Kramer is its president. Ikam, Ltd., is a Ghana-based corporation, and Stephen K. Amoa–Marfo is its chairman of the board. In January of 1998, Mr. Amoa–Marfo sought investors for a housing construction project in Ghana. To that end, he entered into discussions with Mr. Kramer, first by telephone and then in person. As a result of these negotiations, Mr. Kramer agreed to secure financing for the development project, and Mr. Amoa–Marfo transferred a total of $75,000 to Mr. Kramer and KAI.

kind of things he [Mr. Kramer] didn't put—that did not represent what he and I had discussed." Mr. Amoa–Marfo also said that the contract would have to be reviewed and approved by Ikam's attorney and board of directors before he could sign it. The proposed contract contained a clause stating that "Ikam will pay Kramer Associates, Inc.... a deposit of U.S. $75,000 which will be credited against any payment requirements." Without ever signing the proposed agreement, Mr. Amoa–Marfo ultimately transferred a total of $75,000 to KAI, which Mr. Kramer acknowledged in a March 19 fax. That fax also stated that "we are committed to each other."

Mr. Amoa–Marfo confirmed, in two faxes sent on March 30, that the payments had in fact been made.[1] The first fax made reference to a "joint venture" in "estate development," "marketing of Ikam products in the Middle East,"[2] and a "chocolate factory." The second fax stated, "I believe you are totally committed to this project.... [W]e are a winning team and I am sure you will do your utmost to ensure that this joint venture works out to our mutual benefit."

Between February and August of 1998, Mr. Kramer sent seven faxes to Mr. Amoa–Marfo asking for information about "the property" and "the lands." During that time, Mr. Kramer also made at least one inquiry into land development in Ghana.[3] In September 1998, Ikam completed a feasibility report on the housing development project and informed Mr. Kramer that an additional three million dollars would be necessary to finance it. Mr. Amoa–Marfo asked Mr. Kramer to "let me know as soon as possible if and when you will be able to raise the finances ...." Mr. Kramer acknowledged in a fax on November 10, 1998, that Ikam's "work on the property is excellent," but expressed skepticism over the financing aspects of the project.

On February 12, 1999, Mr. Kramer stated in a fax that he had "people actively reviewing the [property] investment," although he was concerned about the progress of the project because it "took a long time for the documents to come forward" from Ikam. In May of 1999, however, Mr. Amoa–Marfo began requesting a full refund of the $75,000 after Mr. Kramer had failed to find any investors.[4] The "joint venture" disintegrated, and an August 30, 1999, fax from Mr. Kramer to Mr. Amoa–Marfo confirmed that business dealings between the two had ceased.

The primary dispute at trial involved the purpose of the $75,000 transfer. KAI and Mr. Kramer characterized the money as "a payment to our company to justify our working on the projects." Mr. Amoa–Marfo testified, however, that it was "seed money to show credibility to the people

---

1. It appears that the transfers were made in two stages. First, Mr. Amoa–Marfo made payments of $15,000 (to Mr. Kramer's "London lawyer") and $20,000 (to Mr. Kramer's personal account). After an exchange of faxes and telephone calls, Mr. Amoa–Marfo transferred an additional $40,000 to Mr. Kramer's account.

2. Ikam's products consist primarily of "security printing," which involves the "printing of financial documents such as stamps, postal orders and passports."

3. In addition, Mr. Kramer made several inquiries about potential markets for Ikam's products. Ikam's dissatisfaction stemmed primarily from Mr. Kramer's apparent lack of effort in securing financing for the development project, however, so in this opinion we need not discuss the marketing endeavors in any detail.

4. As we shall discuss in greater detail, Mr. Amoa–Marfo began asking for a partial refund as early as April of 1998, less than a month after transferring the money.

that this is not just anybody but somebody who is credible enough to go to business with." Mr. Poku–Kwateng also testified about his understanding of the purpose of the $75,000 payment: "And if Mr. Marfo gives him $75,000 as seed, he will refund the money back to him when the project is about to take off, he will refund the money back to Mr. Marfo."

After reviewing this evidence, the trial court first found that there was never "a meeting of the minds between the parties." According to the court:

> This is especially true with respect to the $75,000. What is clear is that the Defendant accepted the $75,000 and did virtually nothing to secure financing for the project. Under these circumstances, an unjust enrichment has occurred, and justice and equity require that Defendant make restitution.

The court went on to find that Mr. Kramer's testimony regarding his efforts to secure financing was not credible. It also held that corporate formalities had not been observed, and thus it was appropriate to pierce the corporate veil and hold Mr. Kramer individually liable, along with KAI, for the $75,000 restitution.

## II

Appellants contend that the trial court erred in concluding that there was no agreement between the parties[5] and in awarding damages for unjust enrichment. We address each contention in turn.

### A. *The Alleged Agreement*

■ "The determination whether an enforceable contract exists, when based on the contract documents, is a question of law ...." *Rosenthal v. National Produce Co.*, 573 A.2d 365, 369 n. 9 (D.C.1990). When the determination is based on oral representations, it is "likewise [a question] of law." *Id.* We therefore review *de novo* the trial court's decision that no contract existed; the "clearly erroneous" standard of review does not apply. *See L.K. Comstock & Co. v. United Engineers & Constructors, Inc.*, 880 F.2d 219, 221 (9th Cir. 1989) ("factual findings [by the court] as to what the parties said or did are reviewed under the 'clearly erroneous' standard, while principles of contract interpretation applied to the facts are reviewed de novo"); *United States v. John McShain, Inc.*, 103 U.S.App. D.C. 328, 330–331, 258 F.2d 422, 424–425, *cert. denied*, 358 U.S. 832, 79 S.Ct. 52, 3 L.Ed.2d 70 (1958).

■ As the parties asserting the existence of a contract, appellants have the burden of proving that one existed. *Jack Baker, Inc. v. Office Space Development Corp.*, 664 A.2d 1236, 1238 (D.C.1995). In the District of Columbia and virtually everywhere else, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms, and (2) intention of the parties to be bound." *Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985) (citation omitted); *accord, e.g., Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995) (" 'to establish a contract the minds of the parties must be in agreement as to its

---

**5.** Appellants erroneously assert that the trial court's finding that there was no agreement between the parties was premised on the court's determination that Mr. Kramer's testimony was not credible. In fact, the court's primary basis for holding that no contract existed was the lack of "a meeting of the minds" with regard to the purpose of the $75,000 payment. The court's concern with Mr. Kramer's credibility appears mainly to have influenced its determination that KAI and Mr. Kramer were unjustly enriched, since they had received a large sum of money from Ikam, but had done "virtually no work" (despite Mr. Kramer's testimony to the contrary) in return.

terms'" (citations omitted)). Unless the statute of frauds requires otherwise in a particular case, the contract need not be written; "parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness." *Jack Baker*, 664 A.2d at 1238 (citations omitted).

Appellants maintain that "the agreement between KAI and Ikam was embodied in the document that KAI executed on March 13, 1998, even though Ikam never executed that document." Specifically, the proposed contract contained a clause stating that "Ikam will pay Kramer Associates, Inc. . . . a deposit of U.S. $75,000 which will be credited against any payment requirements." It also contained two paragraphs which provided for "start-up" payments of $50,000 for financing work (paragraph 3) and $25,000 for marketing (paragraph 5). Mr. Kramer stated at trial that "[paragraphs] three and five add up to seventy-five thousand and those are the two projects . . . that we worked on."[6] Thus, appellants argue, the fact that Mr. Amoa–Marfo ultimately transferred a total of $75,000 to KAI and Mr. Kramer (even though Mr. Amoa–Marfo did not sign the document), coupled with the fact that KAI "embarked on the work agreed to," is evidence that "the parties were proceeding in accordance with the arrangements described in the agreement . . . ."

█ Appellants are correct in asserting that the absence of Mr. Amoa–Marfo's signature on the proposed contract does not, by itself, invalidate any potential agreement between the parties. *See Davis v. Winfield*, 664 A.2d at 838. While a "meeting of the minds," or mutual assent, "is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of a contract. The parties' acts at the time of the making of the contract are also indicative of a meeting of the minds . . . ." *Id.* (citations omitted). Contrary to appellants' assertions, however, the parties' acts in this case do not prove mutual assent, and the trial judge was correct in so concluding.

█ Appellants insist that the $75,000 was "a non-refundable start-up fee to induce KAI to begin work on the projects, which KAI did." Appellee, on the other hand, characterizes the $75,000 as "seed money," held as a "good faith deposit" "in an effort to induce investors . . . ." In support of this interpretation, appellee cites numerous communications from Mr. Amoa–Malfo in which he asked for a refund of part or all of the money.[7] Appellee also provided testimony from Mr. Poku–Kwateng, who participated in the initial

---

**6.** It should be noted that paragraph 4 of the same document makes reference to another start-up payment of $100,000, but somehow this sum did not figure in Mr. Kramer's calculations.

**7.** Less than a month after transferring the $75,000, Mr. Amoa–Marfo began requesting that it be partially refunded. On April 8, 1998, Mr. Amoa–Marfo faxed Mr. Kramer and asked him to return $20,000 to Mr. Amoa–Marfo's account "as agreed." In another fax dated April 28, 1998, Mr. Amoa–Marfo stated that he was "expecting a refund of USD 25,-000," since "the total amount [he] was pre-

pared to pay was USD 50,000." In addition, he noted that he had "agreed to make another payment [after the initial $35,000] as our credibility was at stake." Yet another fax on August 3, 1999, asked for a return of the full $75,000, remarking that the money had been transferred to Mr. Kramer "on trust." On August 13, 1999, Mr. Amoa–Marfo sent a fax informing Mr. Kramer that "we agreed that the $75,000 was my contribution towards a project. There has been no project so far." He again asked that the money be transferred back to his account.

telephone calls with the parties, that he understood the $75,000 to be "seed" money.

Given this conflict in the evidence as to the purpose of the $75,000 transfer, we hold that the trial court could, and did, reasonably find that appellants failed to prove there was an "agreement as to all material terms" of the contract. Neither the (unsigned) contract itself nor the parties' actions pursuant to their negotiations support the argument that there was an agreement as to the purpose of the $75,000. Moreover, as we pointed out in the *Rosenthal* case:

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of the agreement have often been held to prevent the creation of an enforceable contract.

*Rosenthal,* 573 A.2d at 369–370 (*quoting* 1 A. CORBIN, CORBIN ON CONTRACTS § 95, at 394 (1963)). In this case, not only did Mr. Amoa–Marfo fail to sign the proposed contract, but he clearly believed that he was entitled to the return of at least some of the money. While it may be true that Mr. Kramer saw the $75,000 payment as an assent to the terms of the written contract, it is equally plausible that Mr. Amoa–Marfo understood, as his faxes suggest, that the money was transferred in "trust" to

prove his "credibility." Thus, even if both parties believed that a contract had been formed,[8] it would be impossible for any court to determine what the terms of that contract were, since nowhere in the record is there any clear indication of the actual purpose of the $75,000 transfer. In these circumstances, we simply cannot say that "the promises and performance to be rendered by each party are reasonably certain." *Rosenthal,* 573 A.2d at 370.

### B. *Unjust Enrichment*

The trial court concluded that "the Defendant accepted the $75,000 and did virtually nothing to secure financing for the project. Under these circumstances, an unjust enrichment has occurred, and justice and equity require that Defendant make restitution." The court's determination that KAI did not endeavor to secure financing for the project stemmed largely from its finding that Mr. Kramer was not a credible witness, and that he was not truthful about his efforts. Appellants challenge this part of the court's decision on two grounds. They maintain, first, that Ikam "never alleged unjust enrichment as a cause of action," and second, that Ikam "did not submit sufficient evidence to make a case of unjust enrichment." Neither argument has merit.

### 1. *The Pleadings*

■ Appellants claim that the trial court "erred in granting relief to Ikam that Ikam never sought or proved." According to appellants, "a plaintiff's relief in a civil action is limited to his complaint. The fact that some allegations in the case ... could establish a case for [a different cause of action] is immaterial because that claim is not made." Thus, because Ikam did not assert in its complaint that KAI

---

**8.** The fact that Ikam initially filed suit for "breach of contract" certainly suggests the parties may have been under the impression that a contract had, in fact, been formed.

had been unjustly enriched, appellants maintain that Ikam cannot benefit from the doctrine of unjust enrichment. Appellants are plainly incorrect.

■ Super. Ct. Civ. R. 15(b) provides, in relevant part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In this case, appellee's initial complaint made clear that it was suing for $75,000 in restitution because KAI failed to fulfill its obligations to Ikam after receiving the money. At trial, once KAI's retention of the $75,000 was established (it was essentially undisputed), one of the main issues was the reason for KAI's subsequent lack of work on the actual project. On this record, we think it is clear that unjust enrichment was, at the very least, tried by implied consent of the parties.

> The mere fact that [appellee] characterized [its] case as an action for breach of contract rather than for [unjust enrichment] is not binding on either this court or the trial court, nor is it fatal to [appellee's] claim for relief. Modern rules of procedure have greatly relaxed the strict pleading requirements of former years.

*Brown v. Dyer*, 489 A.2d 1081, 1083 (D.C. 1985).

### 2. The Evidence

■ The question of whether unjust enrichment occurred is one of law, which we decide *de novo*. *4934, Inc. v. District of Columbia Dep't of Employment Services*, 605 A.2d 50, 55 (D.C.1992). In this case, however, the trial court's conclusion that an unjust enrichment had occurred was based at least in part on a credibility determination. Thus we must "treat the court's factual findings as presumptively correct unless they are clearly erroneous or unsupported by the record. That presumption properly exists because the trial court heard the testimony and evaluated its credibility." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546 (D.C.1981).

■ "Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another." *4934, Inc.*, 605 A.2d at 55. The party who retains the benefit is obliged to make restitution to the person who conferred the benefit " 'if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to retain it.' " *Id.* at 56 (*quoting* RESTATEMENT OF RESTITUTION § 1 cmt. c (1937)). It is undisputed that Ikam transferred a total of $75,000 to KAI, and that KAI did not repay any of that money to Ikam, despite repeated demands for its return. Thus it is plain that appellants retained a benefit.

The only remaining question is whether it was "unjust" for appellants to retain that benefit under the circumstances presented. The trial judge determined that it was, because she concluded that appellants did not perform any work in exchange for the $75,000. Mr. Kramer testified that he "started to chase down at cost every possibility to get started." He claimed that he had contacted several organizations and individuals in an attempt to secure financing, and that he had even approached Yassir Arafat and the "current Prime Minister" [9] in an effort to "put[ ] [his] obligations

---

9. It appears that the trial judge believed this comment to be a reference to Ariel Sharon, the Prime Minister of Israel. Appellants assert in their brief that Mr. Kramer was referring to "the Palestinian Authority's Prime Minister at the time ...." The distinction is irrelevant, however, because the judge determined that, considered as a whole, Mr. Kramer's testimony was "not credible."

to Marfo on the list ...." The judge found this latter assertion particularly incredible. That statement alone, however, was not the only basis for the judge's decision to discredit Mr. Kramer's testimony about his efforts on the Ikam project. She found that, overall, Mr. Kramer "did not present himself as a truthful person" and that he was "extremely evasive and non-responsive when questioned by Plaintiff's counsel."

Aside from Mr. Kramer's testimony, which the judge found incredible, the record is virtually devoid of any evidence that Mr. Kramer actively sought financing for Ikam's development project. An October 27, 1998, fax from Mr. Kramer to Mr. Amoa–Marfo made reference to a company called "Taylor Woodrow" and stated, "I will talk to them first. It may be an opportunity." On February 12, 1999, Mr. Kramer informed Mr. Amoa–Marfo that he had "people actively reviewing the investment." Finally, Mr. Kramer stated in an August 12, 1999, fax that he had "raised the matter with the Rothschild Bank in London." These vague and unsupported references to initial contacts with various companies and individuals do not contradict or refute the judge's conclusion that Mr. Kramer did "virtually nothing to secure financing for the project."

Nothing in the record suggests that the trial court's finding that Mr. Kramer did not do any meaningful work on the development project was clearly erroneous. Because we must accept that finding as correct, *see* D.C.Code § 17–305(a) (2001), it follows that it was unjust for KAI to retain the $75,000 payment, and that restitution was properly ordered.

### III

We agree with the trial court's conclusion that no agreement existed between the parties, and we also agree that appellants were unjustly enriched and must therefore pay restitution in the amount of $75,000. The judgment is accordingly

*Affirmed.*