*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 20-PR-0729

IN RE ESTATE OF BERTIE MAE FULTON;
RODNEY JAMES LURK, APPELLANT,

v.

NAYDINE FULTON-JONES, PERSONAL REPRESENTATIVE, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015 ADM 000095)

(Hon. Craig Iscoe, Probate Judge)

(Argued September 27, 2022               Decided January 5, 2023)

*Stephen L. Watsky* for appellant.

*Johnny M. Howard* for appellee Naydine Fulton-Jones, personal representative of the Estate of Bertie Mae Fulton.

*Thomas J. Moran* filed a Statement in Lieu of Brief for appellee U.S. Specialty Insurance Company adopting the arguments of appellee Naydine Fulton-Jones.[1]

Before EASTERLY and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

---

[1] Heirs-at-law Geraldine Y. Buie-Farmer, Estate of Rosalind L. Harrison, Tonya Newsome, and Kenya Pankey, who appeared pro se in probate court, did not file briefs of their own or join Mr. Lurk's brief.

Opinion for the court by *Associate Judge* EASTERLY.

Concurring opinion by *Associate Judge* EASTERLY at page 28.

EASTERLY, *Associate Judge*: The probate court reopened the estate of Bertie Mae Fulton after additional assets came to light: two joint bank accounts totaling approximately $470,000. Naydine Fulton-Jones—personal representative of the estate, one of Ms. Fulton's daughters, and the additional individual listed on the bank accounts—claimed that the funds had passed to her outside of probate upon her mother's death because she had a right of survivorship under the District's Uniform Nonprobate Transfers on Death Act ("D.C. UNTDA"), D.C. Code § 19-601.01 et seq. The probate court agreed, reasoning that the signature cards for the two accounts in conjunction with a 2013 bank manual, which assumed a right of survivorship, constituted the operative contracts of deposit; these contracts were substantially in the form prescribed by the D.C. UNTDA; and the D.C. UNTDA therefore authorized the nontestamentary transfer of the money in these accounts to Ms. Fulton-Jones as the surviving account holder. On appeal, heir Rodney James Lurk, through his conservator, argues that the 2013 bank manual is not part of the contracts of deposit for the two accounts; the contracts of deposit were not substantially in the form prescribed by the D.C. UNTDA; and thus, per the statute, Ms. Fulton's intent for the account funds to become part of her estate should control.

The probate court appeared to rule as a matter of law that bank manuals are always part of the contract of deposit. While we agree that a bank manual may, in some circumstances, be considered part of the contract of deposit for the purposes of the D.C. UNTDA, we hold that the party seeking to rely on a bank manual must still prove in the individual case that a bank manual was part of the contract, just as a litigant in a non-UNTDA setting would have to first prove that a document was part of a contract in order to seek enforcement of that document's terms. Examining the record in this case, we conclude that, because Ms. Fulton-Jones failed to prove that her mother was ever alerted to the existence of the bank manual in question, the manual could not define the terms of the contracts of deposit for purposes of determining rights of survivorship for the two accounts. Without the bank manual, the only proffered evidence of the contracts of deposit for the two accounts was the signature cards. The signature cards are manifestly not in substantially the same form as provided in D.C. Code § 19-602.04(a) of the D.C. UNTDA so as to foreclose separate consideration of the account holder's intent under D.C. Code § 19-602.04(b). We thus reverse the holding of the probate court and remand for separate consideration of Ms. Fulton's intent for the disposition of these accounts after her death.

## I. The D.C. UNTDA

Under the District's common law, joint bank account holders owned their respective deposited funds during their lifetimes, and upon the death of one account holder, the decedent's contributions to the account "were treated as assets of the decedent's estate unless the survivor-claimant established ownership of the funds by virtue of a valid *inter vivos* gift." *In re Estate of Blake*, 856 A.2d 1151, 1154 (D.C. 2004). Because "[t]he inclusion of a right of survivorship in an agreement for a joint bank account . . . does not meet testamentary requirements," even such an agreement could not override the common law that a joint account opened for the depositor and a second party without consideration was "presumed opened for the convenience of the [depositor]." *Id*.

This common-law prohibition on recognizing a right of survivorship within a joint account itself was discarded, however, with the passage of the District's Uniform Nonprobate Transfers on Death Act in 2001. *See* Omnibus Trusts and Estates Amendment Act of 2000, D.C. Law 13-292, 48 D.C. Reg. 2087 (Apr. 27, 2001). Based on a model statute,[2] the D.C. UNTDA was "intended to effectuate the

---

[2] *See* Unif. Nonprob. Transfers on Death Act § 101 et seq. (Nat'l Conf. of Comm'rs on Unif. State Laws 1991).

passage of funds in a joint account to the remaining account holders . . . outside of probate even though no *inter vivos* gift was made." *Blake*, 856 A.2d at 1153. To this end, the statute designates as "nontestamentary"—i.e., enforceable without formalities of wills, outside of probate—the provisions for the transfer of funds upon one's death in a variety of legal instruments, including "account agreement[s]." *See* D.C. Code § 19-601.01(a); *see also id.* § 19-602.03(a) (defining types of accounts and explaining that a "multiple-party account may be with or without a right of survivorship between the parties").

Beyond generally authorizing joint accounts to have enforceable rights of survivorship by their terms, the D.C. UNTDA makes clear in Subchapter II (§§ 19-602.01 to 19-602.27) how rights of survivorship may be expressed or discerned in joint accounts, allowing for a range of multiple-party accounts for "various purposes." *Dennis v. Edwards*, 831 A.2d 1006, 1012 (D.C. 2003). Specifically, § 19-602.04(a) provides a form (reproduced *infra* Part III.B.) for depositors to select the type of account desired. The form provides options to create a single- or multiple-party account, to designate a payment-on-death recipient and/or a right of survivorship, and to designate an agent to act for a party to the account. *Id*. "A contract of deposit that contains provisions in substantially the . . . form" set forth in § 19-602.04(a) "establishes the type of account provided, and the account is

governed by the provisions of . . . [S]ubchapter [II] applicable to an account of that type." *Id.* "A contract of deposit that does not contain provisions in substantially the form provided in [§ 19-602.04(a)] is governed by the provisions of [Subchapter II] applicable to the type of account that most nearly conforms to the depositor's intent." *Id.* § 19-602.04(b).

D.C. Code § 19-602.11 sets forth who owns the funds in a multiple-party account during the lifetime of an account holder, and D.C. Code § 19-602.12 maps out what happens to the funds after the death of an account holder for each type of account. In pertinent part, § 19-602.12(a) states that, "[e]xcept as otherwise provided in [Subchapter II], on death of a party sums on deposit in a multiple-party account belong to the surviving party or parties." *Id.* And § 19-602.12(c) states that "[s]ums on deposit . . . in a multiple-party account that, by the terms of the account, is without right of survivorship, are not affected by death of a party"; instead, "the amount to which the decedent, immediately before death, was beneficially entitled under section 19-602.11 is transferred as part of the decedent's estate." *Id.* The type of account at the time of death controls. *Id.* § 19-602.13(a).

The D.C. UNTDA applies to accounts in existence prior to its April 27, 2001, effective date. *See id.* § 19-602.03(b).

## II. Facts[3]

Bertie Mae Fulton died intestate in 2014. One of her daughters, Naydine Fulton-Jones, was appointed as the personal representative for her estate. The probate court approved the final account for the estate in 2017; disagreement among the heirs, however, led another daughter to file a pro se petition contesting the final account. After allegations that at least one of Ms. Fulton's bank accounts had not been included in the estate, the probate court referred the matter to the Auditor-Master pursuant to Super. Ct. Civ. R. 53 to "investigate and state all necessary accounts" of Ms. Fulton and "file a written report with appropriate findings and recommendations."

In a series of hearings before the Auditor-Master throughout 2017 and 2018, two Citibank accounts—which we identify by the last four digits of their respective account numbers, "the 1285 account" and "the 6791 account"—came to light that

---

[3] The following facts are based on submissions to and findings by the Auditor-Master that were uncontested by the parties (or contested only as to the legal arguments they supported). The probate court did not make any findings of fact in the order on review. *But see* Super. Ct. Civ. R. 52(a)(1) ("[T]he court must find the facts specially and state its conclusions of law separately."). Notably, Ms. Fulton-Jones did not include a fact section in her brief to this court, which indicates that she does not dispute the facts as set forth in Mr. Lurk's brief. *See* D.C. App. R. 28(b)(3).

totaled approximately $470,000 at the time of Ms. Fulton's death.[4]  By the time of her mother's death, Ms. Fulton-Jones was named on the accounts along with her mother, but her mother had deposited most if not all of the funds in the accounts.[5] As the surviving account holder, Ms. Fulton-Jones argued that she owned the entirety of the funds in these accounts through right of survivorship under the D.C. UNTDA.  The other heirs to Ms. Fulton's estate, including Mr. Lurk, argued that these accounts did not carry a right of survivorship under the D.C. UNTDA and so the funds should pass to them through the estate.

The 1285 account was opened in 1991, but no documentation from the date of opening is in the record.  A 1996 signature card marked "UPDATE" lists Ms. Fulton and Ms. Fulton-Jones as the account holders and bears their respective signatures.  The signature card contains no language about account terms and conditions, no indication that the account holders were choosing or assenting to anything, and no statement about rights of survivorship, payment on death, or power-

---

[4] Ms. Fulton may have had a third Citibank account as well, but due to a lack of records regarding this account, the Auditor-Master assumed, and the parties have not disputed, that there were no funds in it at the time of Ms. Fulton's death.

[5] Before the Auditor-Master, Ms. Fulton-Jones claimed she deposited some of her own funds but never provided evidence of this (or an exact sum) and conceded that it was "a drop in the bucket" compared to the total in the accounts.

of-attorney designations. Ms. Fulton-Jones was still listed as an account holder of the 1285 account at the time of Ms. Fulton's death.

The 6791 account appears to have been opened in 2000, despite some conflicting evidence indicating an earlier date. A signature card from 2000 lists only Ms. Fulton's name and has her signature at the bottom. Above the signature line, there is a printed statement that reads, "I . . . agree to be bound by any agreement governing any account identified on this card,"[6] but the card itself contains no specific reference to bank manuals or any statement regarding rights of survivorship, payment on death, or power-of-attorney designations.[7] Although no signature cards were produced indicating a change of ownership, Ms. Fulton-Jones was listed as an account holder of this account at the time of Ms. Fulton's death.

Before the Auditor-Master, Ms. Fulton-Jones argued that the D.C. UNTDA flipped the common-law script and created a "default rule" or a presumptive right of survivorship in joint accounts that had not been rebutted. In addition, she argued

---

[6] The card also says that, by signing, the account holder "accept[s] the account opening procedures described on the reverse side" of the card. The record does not include any information about the reverse side of the card.

[7] A Citibank employee testified before the Auditor-Master that the bank has since revised the content of its signature cards, and those used as of 2018 span multiple pages.

that the signature cards in conjunction with the bank's manual in effect at the time of Ms. Fulton's death created the "contract[s] of deposit" for the 1285 and 6791 accounts that by their terms specified a right of survivorship that was enforceable under the D.C. UNTDA. Ms. Fulton-Jones submitted a Citibank manual from 2013 ("2013 Manual") containing account terms and conditions.[8] The 55-page manual states at the outset: "[w]hen you open a Citibank deposit account, you are agreeing that your account will be governed by this Client Manual." Several pages later, in the definition of "joint account," the manual states that an account in the names of more than one person "will automatically pass to the surviving joint owner[]," and "[u]nless [the account holder] designate[s] otherwise on [their] signature card, application or other bank documentation, [the bank] will assume that personal accounts opened by two or more individuals are intended to be joint tenancy accounts with the right of survivorship." Ms. Fulton-Jones submitted no evidence that her mother was ever given notice of or the opportunity to assent (or object) to the 2013 Manual.[9]

---

[8] Ms. Fulton-Jones also submitted copies of bank manuals from other years to the Auditor-Master, but given that she took the position that the 2013 Manual was in effect at the time of her mother's death, we do not discuss these other manuals.

[9] Ms. Fulton-Jones presented testimony from a Citibank witness that the bank sends its manuals out annually to its account holders and notifies them of changes. But at the time of her testimony in 2018, this witness had only been with the bank for two years, and she had no knowledge of the bank's practices before her tenure.

To determine how to treat the 1285 and 6791 accounts under the D.C. UNTDA, the Auditor-Master considered whether the 2013 Manual was part of the contracts of deposit governing these accounts and concluded the manual had "not been factually proven to be controlling." Regarding the 1285 account, the Auditor-Master noted that the signature card contained "no language . . . that addresses the terms of the account agreement or references any other client manual or agreement." Regarding the 6791 account, the Auditor-Master noted that the signature card did not include language mirroring the manual "that the agreement is subject to any amendment that may be made with or without notice by Citibank," and that there was "no documentation" to support a determination that Ms. Fulton had been sent a copy of the 2013 Manual.

Alternatively, the Auditor-Master found that whether or not the account "contract[s] of deposit" included the 2013 Manual as well as the signature cards, they were not substantially in the D.C. UNTDA model form in § 19-602.04(a). Specifically as to the 2013 Manual, the Auditor-Master concluded that "[§ 19-602.04(a)] does not allow the important terms in the form to be buried in fine print in a document that a depositor does not sign and may never see." Considering evidence of Ms. Fulton's intent pursuant to § 19-602.04(b), the Auditor-Master found it "clear and convincing" that Ms. Fulton intended the account funds to benefit

all of her daughters. The Auditor-Master thus concluded that the joint bank accounts did not carry a right of survivorship and the accounts should be included as estate assets.

The probate court rejected the conclusions of the Auditor-Master. The court first determined that the 2013 Manual should be considered as part of the contract of deposit for the Citibank accounts, reasoning that it had long been established that such documents are binding on account holders. The court concluded that the signature cards in conjunction with the 2013 Manual formed contracts of deposit for both accounts that were "substantially" in the form set forth in § 19-602.04(a). The court then determined that "it follows that as a multiple-party account with a right of survivorship, the funds in the account pass to Ms. Fulton-Jones by right of survivorship. *See* D.C. Code § 19-602.12(a)." The court did not address Ms. Fulton-Jones's argument that the D.C. UNTDA created a presumption of a right of survivorship in a joint account that had not been rebutted. This timely appeal by one of the other heirs, Mr. Lurk, followed.

### III.    Analysis

On appeal, Mr. Lurk argues that the probate court was wrong to consider the 2013 Manual as part of the contracts of deposit under § 19-602.04(a) for the two disputed accounts and that Ms. Fulton-Jones' unaddressed argument that §§ 19-602.12(a) and (c) establish a presumption of a right of survivorship is without merit. Instead, Mr. Lurk argues that because the signature cards on their own did not substantially conform to the form contract of deposit set forth in § 19-602.04(a), the probate court should have considered evidence of Ms. Fulton's intent pursuant to § 19-602.04(b) and should have adopted the Auditor-Master's findings that Ms. Fulton intended the funds in the two accounts to become part of her estate.

We review these questions of statutory interpretation de novo. *Reed v. Rowe*, 195 A.3d 1199, 1204 (D.C. 2018).

### A.    Whether the "Contract[s] of Deposit" Include the 2013 Manual Under the D.C. UNTDA

To determine what is included in the "contract of deposit" within the meaning of § 19-602.04(a), we look first to the text of the D.C. UNTDA. *See In re Estate of Green*, 816 A.2d 14, 17-18 (D.C. 2003). The D.C. UNTDA contains a definitional

section, § 19-602.01, in which it uses "contract of deposit" to define two other statutory terms: "account,"[10] and "terms of the account."[11]  It does not, however, provide a standalone definition for this building-block term and thus does not resolve whether, or when, for the purposes of the D.C. UNTDA, a "contract of deposit" includes a bank manual.

In the absence of a statutory definition, we look to blackletter contract principles to inform our understanding of this term for purposes of § 19-602.04(a).  *Cf. Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007, 1013 (D.C. 2020) (looking to the common law to define partnership "property" where it was not defined in the statute that the court had to interpret).  "The relationship between a bank and a depositor is a contractual relationship that is governed by the written agreement between the parties."  *Geiger v. Crestar Bank*, 778 A.2d 1085, 1090 (D.C. 2001) (internal quotation marks omitted).  Just like any other contract, an enforceable contract of deposit requires "(1) an agreement to all material terms, and (2) intention of the parties to be bound."  *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940

---

[10] D.C. Code § 19-602.01(1) (defining "[a]ccount" as "a contract of deposit between a depositor and a financial institution," and to include "a checking account, savings account, certificate of deposit, and share account").

[11] D.C. Code § 19-602.01(12) (defining "[t]erms of the account" to include "the deposit agreement and other terms and conditions, including the form, of the contract of deposit").

A.2d 996, 1002 (D.C. 2008) (internal quotation marks omitted); *see also Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 252 (D.C. 2005) (requiring evidence of "mutual assent" to enforce a contract).

"Even before the written terms of a contract are interpreted and applied, . . . we must ascertain that they are the terms binding upon the parties." *Sutton v. Banner Life Ins. Co.*, 686 A.2d 1045, 1048 (D.C. 1996).  Contracts may incorporate multiple documents from different sources, *see, e.g.*, *Geiger*, 778 A.2d at 1091 (analyzing an "account agreement" that "incorporated" other rules and regulations into the contract), but a party alleging that a document is part of a contract bears the burden of proving that to be true, *see Kramer Assocs.*, 888 A.2d at 251 ("[T]he part[y] asserting the existence of a contract . . . ha[s] the burden of proving that one existed."); *Aziken v. District of Columbia*, 70 A.3d 213, 221 (D.C. 2013) ("The burden of establishing the terms of a contract rests upon the party suing thereon." (cleaned up)).

The signature cards are indisputably some evidence of the agreement between Ms. Fulton and Citibank.  *See Riggs Nat'l Bank of Wash., D.C. v. District of Columbia*, 581 A.2d 1229, 1251 (D.C. 1990) ("It is generally held that a binding contract between a bank and its depositors is created by a deposit agreement

contained on a signature card."). We thus begin our analysis of whether the 2013 Manual is part of the contracts of deposit for the 1285 and 6791 accounts by looking at the signature cards for these accounts.

Obviously, the 2013 Manual did not exist in 1996 when the signature card for the 1285 account was signed. Regardless, this signature card does not even make reference to, much less incorporate, a precursor to the 2013 Manual. While there may have been other terms provided at the time the account was opened in 1991 or when the signature card was signed, the record provides no written or other evidence of those terms. *See Kramer Assocs.*, 888 A.2d at 252 (noting that "[t]he parties' acts" can also indicate mutual assent). The 1996 signature card thus provides no foundation on which to conclude that Ms. Fulton assented to the terms of the 2013 Manual such that they constituted part of the contract of deposit for the 1285 account at the time of her death.

The 6791 signature card likewise predates the 2013 Manual. It differs from the 1285 signature card, however, in that it indicates that the signer "agree[s] to be bound by any agreement governing any account identified on this card."[12] To the

---

[12] As noted *supra* note 6, the card also refers to procedures on the reverse side, but the record does not contain a reproduction of the reverse side of the card.

extent this text alerts the account holder to preexisting terms that exist outside the signature card itself, the record does not reflect what those terms were. Moreover, we cannot say that the text of the 6791 signature card expresses Ms. Fulton's prospective assent to any future bank manual. See *infra* the discussion of *Burt v. First Am. Bank*, 490 A.2d 182, 186 n.6 (D.C. 1985). An agreement to be bound by any agreement is inherently circular and simply begs the question of what has been agreed upon.

We turn then to the evidence regarding the 2013 Manual. To be sure, it refers to itself as "an agreement between you [the customer] and us [the bank]." But that alone is insufficient. A party cannot unilaterally declare that they have an agreement with another without evidence that the two have communicated about its terms. *See* Restatement (Second) of Contracts § 3 (Am. L. Inst. 1981) ("An agreement is a manifestation of mutual assent on the part of two or more persons."); *id.* § 23 ("It is essential . . . that each party manifest assent with reference to the manifestation of the other."); *cf.* 1 Timothy Murray, *Corbin on Contracts* § 3.1, at 388 (Matthew Bender rev. 2018) ("[O]ne cannot contract with oneself."); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 366 (D.C. 1984) (incorporating a lease into a sales contract where both documents "specifically referred to the lease as an attachment . . . to the sales contract"). Here, there is no evidence in the record that Ms. Fulton was ever

informed or even aware of the existence of the 2013 Manual. See *supra* Part II. Specifically, there is no evidence of a signature or other writing that evinces Ms. Fulton's assent to the 2013 Manual. *See Corbin* § 4.13, at 803 (noting that a signature can create an enforceable contract even absent evidence of a meeting of the minds); *Kramer Assocs.*, 888 A.2d at 252 (noting that "mutual assent[] is most clearly evidenced by the terms of a signed written agreement" (internal quotation marks omitted)); *Isaac v. First Nat'l Bank of Md., D.C.*, 647 A.2d 1159, 1160 (D.C. 1994) (enforcing a provision of a certificate of deposit agreement *signed* by both joint tenants). And given that there is no evidence in the record that Ms. Fulton was ever aware of the existence of the 2013 Manual or the terms it contained, we cannot say that she even passively agreed to be bound by it. *Compare Malone v. Saxony Co-op. Apts., Inc.*, 763 A.2d 725, 729-30 (D.C. 2000) ("The failure to . . . even discuss an essential term of a contract may indicate that the [necessary] mutual assent . . . is lacking." (internal quotation marks omitted)), *and Chinn v. Lewin*, 16 F.2d 512, 515 (D.C. Cir. 1926) ("The mere sending of a statement by the creditor[—more than we have evidence of in this case—]and the silence of the debtor are not sufficient. There is no meeting of the minds . . . ."), *with Forrest v. Verizon Comms., Inc.*, 805 A.2d 1007, 1010 (D.C. 2002) (holding that a party was given "adequate notice" where they at least had the "opportunity to read" a contract clause even if they did not, in reality, read it), *and Geiger*, 778 A.2d at 1091, 1094 (holding a party

to terms in "Rules and Regulations" mentioned multiple times in account documents where the party "acknowledged that he received a copy" of the relevant documents).

The probate court did not find otherwise. See *supra* note 3. Instead, relying on *Burt*, 490 A.2d at 186 n.6, the court observed that "the ability of a bank to unilaterally change the terms of the contract has not rendered the contract per se invalid." The probate court misread *Burt*. In that case we did not address whether the contract (there a credit agreement) was, in the probate court's words, "per se invalid" based on a unilateral change in terms by the bank. Rather, we determined that the bank was not entitled to summary judgment in light of disputes of fact about whether and when the bank changed the interest rate on the loan pursuant to a provision that ostensibly gave the bank "the right . . . to establish other terms and conditions, which shall be binding to [credit card account holder] thirty days after such notice is given to [account holder]." *Id*. at 186 & n.6. Further distinguishing *Burt*, there was no dispute that the account holder in that case had received a copy of the credit agreement; to the contrary, the account holder herself sought to rely on a separate provision of the agreement that specified the applicable interest rate. *Id.* at 186.

Based on the foregoing, we conclude that Ms. Fulton-Jones failed to carry her

burden to establish that the 2013 Manual was part of the contract of deposit for either the 1285 or the 6791 account.

**B.      Whether the "Contract[s] of Deposit" Were "In Substantially the Form" of D.C. Code § 19-602.04(a)**

Determining that the 2013 Manual is not part of the contracts of deposit for the 1285 and 6791 accounts is a necessary predicate to conducting our analysis under the D.C. UNTDA.  As noted above, D.C. Code § 19-602.04(a) provides that a "contract of deposit that contains provisions in substantially the . . . form" it sets forth "establishes the type of account provided, and the account is governed by the provisions of . . . [S]ubchapter [II] applicable to an account of that type." *Id.*  The form in § 19-602.04(a) provides a set of options and explanations for the depositor:

> PARTIES [Name one or more parties]: _____
>
> OWNERSHIP [Select one and initial]:
> _____SINGLE-PARTY ACCOUNT
> _____MULTIPLE-PARTY ACCOUNT
> Parties own account in proportion to net contributions unless there is clear and convincing evidence of a different intent.
>
> RIGHTS AT DEATH [Select one and initial]:
> _____SINGLE-PARTY ACCOUNT
> At death of party, ownership passes as part of party's estate.

_____SINGLE-PARTY ACCOUNT WITH POD (PAY ON DEATH) DESIGNATION

[Name one or more beneficiaries]:

At death of party, ownership passes to POD beneficiaries and is not part of party's estate.

_____MULTIPLE-PARTY ACCOUNT WITH RIGHT OF SURVIVORSHIP

At death of party, ownership passes to surviving parties.

_____MULTIPLE-PARTY ACCOUNT WITH RIGHT OF SURVIVORSHIP AND POD (PAY ON DEATH) DESIGNATION

[Name one or more beneficiaries]: _____

At death of last surviving party, ownership passes to POD beneficiaries and is not part of last surviving party's estate.

_____MULTIPLE-PARTY ACCOUNT WITHOUT RIGHT OF SURVIVORSHIP

At death of party, deceased party's ownership passes as part of deceased party's estate.

AGENCY (POWER OF ATTORNEY) DESIGNATION [Optional]

Agents may make account transactions for parties but have no ownership or rights at death unless named as POD beneficiaries.

[To add agency designation to account, name one or more agents]: _____

[Select one and initial]:

_____AGENCY DESIGNATION SURVIVES DISABILITY OR INCAPACITY OF PARTIES

_____AGENCY DESIGNATION TERMINATES ON DISABILITY OR INCAPACITY OF PARTIES

*Id.*

There is no serious argument that the signature cards for either account, standing alone, are in substantially the same form as the above, given the sparse language on the cards. Among other differences, neither card makes any reference to the right of survivorship or purports to give an account holder the opportunity to select whether account funds should pass to a surviving account holder or become part of the depositor's estate on death.[13] Accordingly, the signature cards do not "establish the type of account provided" for the purposes of the D.C. UNTDA.

### C.     Looking to Intent Under D.C. Code § 19-602.04(b)

If a contract of deposit is not substantially in the form set forth in D.C. Code § 19-602.04(a), then D.C. Code § 19-602.04(b) directs that the account is "governed by the provisions of [Subchapter II] applicable to the type of account that most nearly conforms to the depositor's intent." Although the Auditor-Master made findings

---

[13] Even if we were to consider the 2013 Manual as part of the contracts of deposit, but see *supra* Section III.A., we have serious doubts it would change this outcome. The D.C. UNTDA form gives the account holder an opportunity to provide a clear and concise expression of their intent for the account funds at death. *See* Omnibus Trusts and Estates Amendment Act of 2000, Report on Bill No. 13-298 before the Committee on Judiciary, Council of the District of Columbia, at 44-45 [hereinafter Judiciary Committee Report]. The bank's "assumption" of rights of survivorship in joint accounts, contained in a 50-plus-page manual, separate from the account holder's signed document, hardly seems to fulfill the form's aim. *See post* at 28 (concurring opinion).

regarding Ms. Fulton's intent, the probate court did not reach this issue. Therefore, we remand to the court to determine the decedent's intent and apply the relevant provisions of the D.C. UNTDA.

Throughout this litigation, Ms. Fulton-Jones has suggested that §§ 19-602.12(a) and (c) together create a "default rule" in favor of survivorship that, in the absence of express account terms to the contrary, obviates examination of her mother's intent under § 19-602.04(b). The probate court did not address this argument. In anticipation of remand, we do so now. *See, e.g.*, *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C. 1984) (providing guidance for the trial court on remand on an issue of first impression).

The same default rule argument was made in *In re Estate of Walker v. Stefan*, 160 A.3d 1165 (D.C. 2017), and we discussed it in a footnote:

> Mr. Stefan [the surviving joint account holder] argues that D.C. Code § 19-602.12(a) creates a presumption that a multiple-party account confers a right of survivorship, and that presumption can be rebutted only if the "terms of the account" provide otherwise, D.C. Code § 19-602.12(c). Mr. Stefan further argues that because the account documents in this case were silent as to a right of survivorship, the account did not by its terms rebut the statutorily presumed right of survivorship. Under this rationale, [the decedent's] intent would be irrelevant.

*Id.* at 1173 n.1. We explained that Mr. Stefan's argument disregarded key text in

§ 19-602.12(a): "Although § 19-602.12(a) does create a default rule that multiple-party accounts confer a right of survivorship, it also states that the default rule is inapplicable if other provisions in the subchapter '*otherwise provide*[].'" *Id.* (alteration in original) (emphasis added). We then observed that "[a]rguably, § 19-602.04(b) provides otherwise in the circumstances to which it applies," *id.*, citing the comments to the uniform law that inspired the D.C. UNTDA, which explain that provisions corresponding to D.C. Code §§ 19-602.04 and 19-602.12 "permit a court to implement the intentions of parties to a joint account governed by" the provision corresponding to D.C. Code § 19-602.04(b) "based on the form of the account and extrinsic evidence tending to confirm or contradict intention as signalled by the form," *id.* (internal quotation marks omitted); *accord* Unif. Nonprob. Transfers on Death Act § 212 cmt. (Nat'l Conf. of Comm'rs on Unif. State Laws 1991)).

Ultimately, we did not resolve in *Estate of Walker* whether § 19-602.12 created a default rule that would obviate consideration of the decedent's intent when considered under § 19-602.04(b) because the decedent's intent and the purported default rule both pointed in the direction of a right of survivorship for Mr. Stefan on the facts of that case. 160 A.3d at 1173 n.1. By contrast, there is a real possibility in this case, as evidenced by the findings of the Auditor-Master, that Ms. Fulton's

intent diverged from any default rule of survivorship under § 19-602.12. Thus, we confront the question we left open in *Estate of Walker*. We conclude that, for the same reasons we indicated skepticism of such an argument in *Estate of Walker*, a determination of intent that an account will not have a right of survivorship under § 19-602.04 cannot be overridden by looking to § 19-602.12.

Again, § 19-602.12(a) says, "[e]xcept *as otherwise provided in this subchapter*, on death of a party sums on deposit in a multiple-party account belong to the surviving party." *Id.* (emphasis added). Taking the statute on its own terms, the "otherwise provided" language puts the analysis squarely back at the determination of intent as a matter of fact in § 19-602.04(b) when there is no form that substantially conforms to § 19-602.04(a). Ms. Fulton-Jones's default rule, by contrast, would render § 19-602.04(b) inapplicable to multiple-party accounts. *But see In re Estate of Waugh*, 123 A.3d 958, 963 (D.C. 2015) (endorsing "examination of the statute as a whole" to fulfill a statute's purpose). Even if a contract of deposit for a multiple-party account were not substantially in the form of § 19-602.04(a), she would say that there is a right of survivorship under § 19-602.12(a), entirely bypassing any application of § 19-602.04(b).

Our prior cases addressing the D.C. UNTDA are not to the contrary. None of

them confronted interpretation of the D.C. UNTDA in the situation that Ms. Fulton-Jones claims here and that the probate court may find on remand: one where the intent of the decedent must be considered under § 19-602.04(b) and runs *against* the right of survivorship. *See Blake*, 856 A.2d at 1157 (remanding the case for further proceedings to address the effect of the D.C. UNTDA, including intent, where the accounts were "designated specifically" as with rights of survivorship); *In re Estate of Bates*, 948 A.2d 518, 525 n.12 (D.C. 2008) (noting there had been no dispute over the issue of rights of survivorship); *Estate of Walker*, 160 A.3d at 1172-73 (upholding the finding that the decedent intended a right of survivorship).[14]

Ms. Fulton-Jones also argues that the purpose of the D.C. UNTDA, as supported by its legislative history, to "establish clearer and more predictable rules to govern the disposition of bank accounts" would be rendered ineffective by

---

[14] A question remains about how § 19-602.04 and § 19-602.12 interact in a situation we do not face here: one where (1) the "contract of deposit" is not in substantially the same form as in § 19-602.04(a); (2) the decedent's intent under § 19-602.04(b) was to have an account *with* right of survivorship; and (3) the "terms of the account" (documents that do not conform to subsection (a) but nonetheless contain "terms of the account") expressly state the account is *without* right of survivorship. *See Estate of Walker*, 160 A.3d at 1170 (concluding that the phrase "by the terms of the account" in § 19-602.12(c) requires express language to negate the right of survivorship). Such a situation could set up a conflict between the decedent's intent and the language of § 19-602.12(c). However, that interpretative question is not raised by these facts and we therefore decline to address it.

interpreting § 19-602.04(b) to allow intent to negate a default rule. *See also Estate of Walker*, 160 A.3d at 1170-71 (quoting legislative history that the D.C. UNTDA "establishes a preference for survivorship"). As we noted above, however, the drafters of the uniform act that served as the basis for the D.C. UNTDA endorsed the interaction between survivorship rights and intent, which helps to inform how we interpret the statute. *See Chase Plaza Condo. Ass'n v. JPMorgan Chase Bank, N.A.*, 98 A.3d 166, 175 (D.C. 2014) (noting that "the official comments by the drafters of . . . uniform acts [on which our laws are based] provide important guidance in construing our provision[s]"). In adopting the more modern version of the uniform law, the District implicitly rejected a previous version that *expressly* contained a presumption of survivorship unless "clear and convincing evidence" showed other intent. Judiciary Committee Report, Statement of John M. McCabe, National Conference of Commissioners on Uniform State Laws, at 7 (July 8, 1999). Many states still use this older language,[15] but the District's law contains no such presumption, leaving room for consideration of the decedent's intent where the contract of deposit is not in substantially the same form as that of § 19-602.04(a).

Accordingly, on remand, the probate court's findings about Ms. Fulton's

---

[15] *See, e.g.*, Cal. Prob. Code § 5302; Haw. Rev. Stat. § 560:6-104.

intent under D.C. Code § 19-602.04(b) will dictate what happens to the account funds.

## IV. Conclusion

For the foregoing reasons, we reverse and remand to the probate court for proceedings consistent with this opinion.

*So ordered.*

EASTERLY, *Associate Judge*, concurring: My colleagues and I conclude above that the 2013 Manual was not part of the contracts of deposit for the two accounts at issue and that the signature cards alone are not "substantially" similar to the form specified in § 19-602.04(a). I write separately only to go beyond the skepticism voiced in note 13, *ante* at 22, and express my view that, even if the evidence had established that the 2013 Manual was part of the contracts of deposit for the two accounts, my conclusion about substantial similarity to the form in § 19-602.04(a) would not have changed. A critical aspect of the form set forth in § 19-602.04(a) is that it provides the account holder with specific, defined alternatives and directs the account holder to make express choices. *See ante* at 20-21 (reproducing the model

form).  As the 2013 Manual's imposed assumption does not allow for such guided, express decision-making, it cannot be deemed to be "substantially" in the form of the statute.

Giving account holders the opportunity to make express, informed choices was a central objective of the D.C. UNTDA.[1]  The form in § 19-602.04(a) realizes this objective.  It sets out a number of decision points and provides a space to the side of each where the account holder can make some sort of mark to indicate a selection.  The account holder must first designate if the account is single-party or multiple-party (which is defined: "Parties own account in proportion to net contributions unless there is clear and convincing evidence of a different intent").

---

[1] *See* Judiciary Committee Report at 42 (explaining that the statute includes "sample statutory forms that provide clear and simple instructions to both the financial institution and depositor in setting up multiple-person accounts"); *see also id.*, Statement of James C. McKay, Jr., Office of the Corporation Counsel, at 4 (July 8, 1999) (explaining that the D.C. UNTDA "encourages banks to offer an array of account forms giving clear choices to depositors" and "clarifies choices among accounts bearing more than one name").  Comments on the uniform law emphasized that the statutory form should allow "a *person establishing* a multiple-party account to state *expressly*" whether there are survivorship rights.  Unif. Nonprob. Transfers on Death Act § 204 cmt. (Nat'l Conf. of Comm'rs on Unif. State Laws 1991) (emphasis added); *see also* Judiciary Committee Report, Statement of John M. McCabe, Nat'l Conf. of Comm'rs on Unif. State Laws, at 7 (July 8, 1999) (noting that the new version of the uniform law has "an easy to use statutory form" that allows "parties [to] choose their type of account, definitively establishing their intent").

*Id*. That selection then leads to other decision points. The holder of a single-party account must decide if "[a]t death of [the] party, ownership passes as [a] part of [the] party's estate" or if the account has a "POD," or "pay on death," designation, and if so to whom the account funds will pass. *Id*. The holder of a multiple-party account must decide if the account has (1) a right of survivorship (which is defined: "At death of party, ownership passes to surviving parties"); (2) a POD designation (again, expressly defined); or (3) no right of survivorship (also expressly defined: "At death of party, deceased party's ownership passes as part of deceased party's estate"). Lastly, the form provides for an "optional" designation of an agent (power of attorney).

The 2013 Manual provides no such clarity of options or decision-making regarding the matters addressed in the § 19-602.04(a) form. Rather, on page seven of a 55-page document, in a definitional section, it explains what is meant by the term "joint account" as one that "automatically pass[es] to the joint surviving owner" and states that, "[u]nless you designate otherwise on your signature card, application or other bank documentation, we will assume that personal accounts opened by two or more individuals are intended to be joint tenancy accounts with the right of survivorship." It does not explain what the alternatives are to a joint account with a right of survivorship or allow the account holder to choose between these options.

It presumes one state of affairs regarding rights of survivorship and puts the onus on the account holder to opt out of that presumed state in a different document that (if it is like the signature cards presented in this case) may not have any prompt to supply this information.[2]

In short, even if we were to consider the 2013 Manual in conjunction with the signature cards for the two accounts, I would still hold that Ms. Fulton's contracts of deposit were not in substantially the form set forth in § 19-602.04(a).

---

[2] My focus is on clarity of options or decision-making specifically with regard to whether or not a joint account has rights of survivorship, but the one other state high court that has examined its analogous provision of its UNTDA, Neb. Rev. Stat. § 30-2719(a), in any detail, has held that all the issues addressed in the statutory form must be covered in order for a contract of deposit to be "substantially" compliant. *See In re Estate of Greb*, 848 N.W.2d 611, 619 (Neb. 2014) (concluding that a signature card was not in substantially the same form where it specified right of survivorship but did not include any "provisions for designation of ownership type or agency"); *Eggleston v. Kovacich*, 742 N.W.2d 471, 476 (Neb. 2007) (concluding a signature card was in substantially the same form where it had provisions for the type of account and survivorship, and a place to designate an agent if desired); *see also Reed v. Rowe*, 195 A.3d 1199, 1207 (D.C. 2018) ("While the [out-of-state] decisions are not binding on us, they are persuasive authority as to the meaning of our version of the uniform law from which [the relevant section] is derived.").